# BELL, WARDEN *v.* CONE

No. 01–400.   Argued March 25, 2002—Decided May 28, 2002

*Michael E. Moore,* Solicitor General of Tennessee, argued the cause for petitioner. With him on the briefs were *Gordon W. Smith,* Associate Solicitor General, and *Jennifer L. Smith,* Assistant Attorney General.

*Lisa Schiavo Blatt* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were *Solicitor General Olson, Assistant Attorney General Chertoff,* and *Deputy Solicitor General Dreeben.*

*Robert L. Hutton,* by appointment of the Court, 534 U. S. 1111, argued the cause for respondent.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

The Tennessee Court of Appeals rejected respondent's claim that his counsel rendered ineffective assistance during his sentencing hearing under principles announced in *Strickland* v. *Washington,* 466 U. S. 668 (1984). The Court of Appeals for the Sixth Circuit concluded that *United States* v. *Cronic,* 466 U. S. 648 (1984), should have controlled the state court's analysis and granted him a conditional writ of habeas corpus. We hold that respondent's claim was governed by *Strickland,* and that the state court's decision neither was

---

*Briefs of *amicus curiae* urging reversal were filed for the State of Ohio et al. by *Betty D. Montgomery,* Attorney General of Ohio, *David M. Gormley,* State Solicitor, and *Matthew Hellman,* Assistant Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *Bill Pryor* of Alabama, *Janet Napolitano* of Arizona, *Bill Lockyer* of California, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Steve Carter* of Indiana, *Richard P. Ieyoub* of Louisiana, *J. Joseph Curran, Jr.,* of Maryland, *Jeremiah W. (Jay) Nixon* of Missouri, *Mike McGrath* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *David Samson* of New Jersey, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *Mark Barnett* of South Dakota, *John Cornyn* of Texas, *Mark L. Shurtleff* of Utah, *Iver A. Stridiron* of the Virgin Islands, *Jerry Kilgore* of Virginia, *Christine O. Gregoire* of Washington, and *Hoke MacMillan* of Wyoming; and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger.*

*Walter Dellinger, Pamela Harris,* and *David M. Porter* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae* urging affirmance.

*Larry W. Yackle* and *Steven R. Shapiro* filed a brief for the American Civil Liberties Union et al. as *amicus curiae.*

"contrary to," nor involved "an unreasonable application of, clearly established Federal law" under the provisions of 28 U. S. C. § 2254(d)(1).

## I

In 1982, respondent was convicted of, and sentenced to death for, the murder of an elderly couple in Memphis, Tennessee. The killings culminated a 2-day crime rampage that began when respondent robbed a Memphis jewelry store of approximately $112,000 in merchandise on a Saturday in August 1980. Shortly after the 12:45 p.m. robbery, a police officer in an unmarked vehicle spotted respondent driving at a normal speed and began to follow him. After a few blocks, respondent accelerated, prompting a high-speed chase through midtown Memphis and into a residential neighborhood where respondent abandoned his vehicle. Attempting to flee, respondent shot an officer who tried to apprehend him, shot a citizen who confronted him, and, at gunpoint, demanded that another hand over his car keys. As a police helicopter hovered overhead, respondent tried to shoot the fleeing car owner, but was frustrated because his gun was out of ammunition.

Throughout the afternoon and into the next morning, respondent managed to elude detection as police combed the surrounding area. In the meantime, officers inventorying his car found an array of illegal and prescription drugs, the stolen merchandise, and more than $2,400 in cash. Respondent reappeared early Sunday morning when he drew a gun on an elderly resident who refused to let him in to use her telephone. Later that afternoon, respondent broke into the home of Shipley and Cleopatra Todd, aged 93 and 79 years old, and killed them by repeatedly beating them about the head with a blunt instrument. He moved their bodies so that they would not be visible from the front and rear doors and ransacked the first floor of their home. After shaving his beard, respondent traveled to Florida. He was arrested

there for robbing a drugstore in Pompano Beach. He admitted killing the Todds and shooting the police officer.

A Tennessee grand jury charged respondent with two counts of first-degree murder in the perpetration of a burglary in connection with the Todds' deaths, three counts of assault with intent to murder in connection with the shootings and attempted shooting of the car owner, and one count of robbery with a deadly weapon for the jewelry store theft. At a jury trial in the Criminal Court of Shelby County, the prosecution adduced overwhelming physical and testimonial evidence showing that respondent perpetrated the crimes and that he killed the Todds in a brutal and callous fashion.

The defense conceded that respondent committed most of the acts in question, but sought to prove that he was not guilty by reason of insanity. A clinical psychologist testified that respondent suffered from substance abuse and posttraumatic stress disorders related to his military service in Vietnam. A neuropharmacologist recounted at length respondent's history of illicit drug use, which began after he joined the Army and escalated to the point where he was daily consuming "rather horrific" quantities. Tr. 1722–1763. That drug use, according to the expert, caused chronic amphetamine psychosis, hallucinations, and ongoing paranoia, which affected respondent's mental capacity and ability to obey the law. Defense counsel also called respondent's mother, who spoke of her son coming back from Vietnam in 1969 a changed person, his honorable discharge from service, his graduation with honors from college, and the deaths of his father and fiancée while he was in prison from 1972–1979 for robbery. Although respondent did not take the stand, defense counsel was able to elicit through other testimony that he had expressed remorse for the killings. Rejecting his insanity defense, the jury found him guilty on all charges.

Punishment for the first-degree murder counts was fixed in a separate sentencing hearing that took place the next day and lasted about three hours. Under then-applicable Ten-

nessee law, a death sentence was required if the jury found unanimously that the State proved beyond a reasonable doubt the existence of at least one statutory aggravating circumstance that was not outweighed by any mitigating circumstance. Tenn. Code Ann. § 39–2–203 (1982). In making these determinations, the jury could (and was instructed that it could) consider evidence from both the guilt and punishment phases. *Ibid.;* Tr. 2219.

During its opening statement, the State said it would prove four aggravating factors: that (1) respondent had previously been convicted of one or more felonies involving the use or threat of violence to a person; (2) he knowingly created a great risk of death to two or more persons other than the victim during the act of murder; (3) the murder was especially heinous, atrocious, or cruel; and (4) the murder was committed for the purpose of avoiding lawful arrest. In his opening statement, defense counsel called the jury's attention to the mitigating evidence already before them. He suggested that respondent was under the influence of extreme mental disturbance or duress, that he was an addict whose drug and other problems stemmed from the stress of his military service, and that he felt remorse. Counsel urged the jury that there was a good reason for preserving his client's life if one looked at "the whole man." App. 26. He asked for mercy, calling it a blessing that would raise them above the State to the level of God.

The prosecution then called a records custodian and fingerprint examiner to establish that respondent had three armed robbery convictions and two officers who said they tried unsuccessfully to arrest respondent for armed robbery after the jewelry store heist. Through cross-examination of the records custodian, respondent's attorney brought out that his client had been awarded the Bronze Star in Vietnam. After defense counsel successfully objected to the State's proffer of photos of the Todds' decomposing bodies, both sides rested. The junior prosecuting attorney on the case

gave what the state courts described as a "low-key" closing.[1] Defense counsel waived final argument, preventing the lead prosecutor, who by all accounts was an extremely effective advocate, from arguing in rebuttal. The jury found in both murder cases four aggravating factors and no mitigating circumstances substantial enough to outweigh them. The Tennessee Supreme Court affirmed respondent's convictions and sentence on appeal, *State* v. *Cone*, 665 S. W. 2d 87, and we denied certiorari, 467 U. S. 1210 (1984).

Respondent then petitioned for state postconviction relief, contending that his counsel rendered ineffective assistance during the sentencing phase by failing to present mitigating evidence and by waiving final argument. After a hearing in which respondent's trial counsel testified, a division of the Tennessee Criminal Court rejected this contention. The Tennessee Court of Criminal Appeals affirmed. *Cone* v. *State*, 747 S. W. 2d 353 (1987). The appellate court reviewed counsel's explanations for his decisions concerning the calling of witnesses and the waiving of final argument. *Id.*, at 356–357. Describing counsel's representation as "very conscientious," the court concluded that his performance was within the permissible range of competency, citing *Baxter* v. *Rose*, 523 S. W. 2d 930 (Tenn. 1975), a decision the Tennessee Supreme Court deems to have announced the same attorney performance standard as *Strickland* v. *Washington*, 466 U. S. 668 (1984). See, *e. g., State* v. *Burns*, 6 S. W. 3d 453, 461 (1999). The court also expressed its view that respondent received the death penalty based on the law and facts, not on the shortcomings of counsel. 747 S. W. 2d, at 357–358. The Tennessee Supreme Court denied respondent permission to appeal, and we denied further review, *Cone* v. *Tennessee*, 488 U. S. 871 (1988).

In 1997, after his second application for state postconviction relief was dismissed, respondent sought a federal writ

---

[1] See *Cone* v. *State*, 747 S. W. 2d 353, 357 (Tenn. Crim. App. 1987).

of habeas corpus under 28 U. S. C. § 2254 as amended by the Antiterrorism and Effective Death Penalty Act of 1996. His petition alleged numerous grounds for relief including ineffective assistance at the sentencing phase. The District Court ruled that respondent did not meet § 2254(d)'s requirements and denied the petition.

The Court of Appeals affirmed the refusal to issue a writ with respect to respondent's conviction, but reversed with respect to his sentence. 243 F. 3d 961, 979 (CA6 2001). It held that respondent suffered a Sixth Amendment violation for which prejudice should be presumed under *United States v. Cronic*, 466 U. S. 648 (1984), because his counsel, by not asking for mercy after the prosecutor's final argument, did not subject the State's call for the death penalty to meaningful adversarial testing. 243 F. 3d, at 979. The state court's adjudication of respondent's Sixth Amendment claim, in the Court of Appeals' analysis, was therefore an unreasonable application of the clearly established law announced in *Strickland*. 243 F. 3d, at 979. We granted certiorari, 534 U. S. 1064 (2001), and now reverse the Court of Appeals.

## II

The Antiterrorism and Effective Death Penalty Act of 1996 modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas "retrials" and to ensure that state-court convictions are given effect to the extent possible under law. See *Williams v. Taylor*, 529 U. S. 362, 403–404 (2000). To these ends, § 2254(d)(1) provides:

> "(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly estab-

lished Federal law, as determined by the Supreme Court of the United States."[2]

As we stated in *Williams*, § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. 529 U. S., at 404–405. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. *Id.*, at 405–406. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. *Id.*, at 407–408. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams* that an unreasonable application is different from an incorrect one. *Id.*, at 409–410. See also *id.*, at 411 (a federal habeas court may not issue a writ under the unreasonable application clause "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly").

Petitioner contends that the Court of Appeals exceeded its statutory authority to grant relief under § 2254(d)(1) because the decision of the Tennessee courts was neither contrary to nor an unreasonable application of the clearly established law of *Strickland*. Respondent counters that he is entitled to relief under § 2254(d)(1)'s "contrary to" clause because the state court applied the wrong legal rule. In his view, *Cronic*, not *Strickland*, governs the analysis of his claim that

---

[2] JUSTICE STEVENS' dissent does not cite this statutory provision governing respondent's ability to obtain federal habeas relief, much less explain how his claim meets its standards.

his counsel rendered ineffective assistance at the sentencing hearing. We address this issue first.

In *Strickland,* which was decided the same day as *Cronic,* we announced a two-part test for evaluating claims that a defendant's counsel performed so incompetently in his or her representation of a defendant that the defendant's sentence or conviction should be reversed. We reasoned that there would be a sufficient indication that counsel's assistance was defective enough to undermine confidence in a proceeding's result if the defendant proved two things: first, that counsel's "representation fell below an objective standard of reasonableness," 466 U. S., at 688; and second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.,* at 694. Without proof of both deficient performance and prejudice to the defense, we concluded, it could not be said that the sentence or conviction "resulted from a breakdown in the adversary process that rendered the result of the proceeding unreliable," *id.,* at 687, and the sentence or conviction should stand.

In *Cronic,* we considered whether the Court of Appeals was correct in reversing a defendant's conviction under the Sixth Amendment without inquiring into counsel's actual performance or requiring the defendant to show the effect it had on the trial. 466 U. S., at 650, 658. We determined that the court had erred and remanded to allow the claim to be considered under *Strickland*'s test. 466 U. S., at 666–667, and n. 41. In the course of deciding this question, we identified three situations implicating the right to counsel that involved circumstances "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id.,* at 658–659.

First and "[m]ost obvious" was the "complete denial of counsel." *Id.,* at 659. A trial would be presumptively unfair, we said, where the accused is denied the presence of counsel at "a critical stage," *id.,* at 659, 662, a phrase we used

in *Hamilton* v. *Alabama*, 368 U. S. 52, 54 (1961), and *White* v. *Maryland*, 373 U. S. 59, 60 (1963) *(per curiam)*, to denote a step of a criminal proceeding, such as arraignment, that held significant consequences for the accused.[3]   Second, we posited that a similar presumption was warranted if "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Cronic, supra,* at 659.   Finally, we said that in cases like *Powell* v. *Alabama*, 287 U. S. 45 (1932), where counsel is called upon to render assistance under circumstances where competent counsel very likely could not, the defendant need not show that the proceedings were affected. *Cronic, supra,* at 659–662.

Respondent argues that his claim fits within the second exception identified in *Cronic* because his counsel failed to "mount some case for life" after the prosecution introduced evidence in the sentencing hearing and gave a closing statement. Brief for Respondent 26. We disagree. When we

---

[3] In a footnote, we also cited other cases besides *Hamilton* v. *Alabama* and *White* v. *Maryland* where we found a Sixth Amendment error without requiring a showing of prejudice.   Each involved criminal defendants who had actually or constructively been denied counsel by government action. See *United States* v. *Cronic,* 466 U. S. 648, 659, n. 25 (1984) (citing *Geders* v. *United States,* 425 U. S. 80, 91 (1976) (order preventing defendant from consulting his counsel "about anything" during a 17-hour overnight recess impinged upon his Sixth Amendment right to the assistance of counsel); *Herring* v. *New York,* 422 U. S. 853, 865 (1975) (trial judge's order denying counsel the opportunity to make a summation at close of bench trial denied defendant assistance of counsel); *Brooks* v. *Tennessee,* 406 U. S. 605, 612–613 (1972) (law requiring defendant to testify first at trial or not at all deprived accused of "the 'guiding hand of counsel' in the timing of this critical element of his defense," *i. e.,* when and whether to take the stand); *Ferguson* v. *Georgia,* 365 U. S. 570, 596 (1961) (statute retaining common-law incompetency rule for criminal defendants, which denied the accused the right to have his counsel question him to elicit his statements before the jury, was inconsistent with Fourteenth Amendment); *Williams* v. *Kaiser,* 323 U. S. 471 (1945) (allegation that petitioner requested counsel but did not receive one at the time he was convicted and sentenced stated case for denial of due process)).

spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete. We said "if counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing." *Cronic, supra,* at 659 (emphasis added). Here, respondent's argument is not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points. For purposes of distinguishing between the rule of *Strickland* and that of *Cronic,* this difference is not of degree but of kind.[4]

The aspects of counsel's performance challenged by respondent—the failure to adduce mitigating evidence and the waiver of closing argument—are plainly of the same ilk as other specific attorney errors we have held subject to *Strick-*

---

[4] In concluding that *Cronic* applies to respondent's ineffective-assistance claim, the dissent relies in part on inferences it draws from evidence that his attorney sought treatment for a mental illness four years after respondent's trial. See *post,* at 715–716 (opinion of STEVENS, J.). While the dissent admits that counsel's mental health problems "may have onset after [respondent's] trial," it speculates that counsel's mental health problems began earlier based on its "complete reading of the trial transcript and an assessment of [counsel's] actions at trial." *Post,* at 716. But, as the dissent concedes, respondent did not present *any* evidence regarding his counsel's mental health in the state-court proceedings. Before us, respondent does not argue that we could consider his attorney's medical records obtained in the federal habeas proceedings in assessing his Sixth Amendment claim, nor does he suggest that his counsel suffered from mental health problems at the time of his trial. Furthermore, any implication that trial counsel was impaired during his representation is contradicted by the testimony of the two experts called during the state postconviction hearing. Both had extensive experience in prosecuting and defending criminal cases and were familiar with trial counsel's abilities. Wayne Emmons said that counsel was "not only fully capable, but one of the most conscientious lawyers [he] knew." State Postconviction Tr. 73. And Stephen Shankman said he considered respondent's counsel "to be one of the finest practitioners in [the] community in the area of criminal defense work," *id.,* at 182, and "an extremely experienced lawyer" whom he would be "hardpressed to second guess," *id.,* at 190.

*land*'s performance and prejudice components. In *Darden* v. *Wainwright*, 477 U. S. 168, 184 (1986), for example, we evaluated under *Strickland* a claim that counsel was ineffective for failing to put on any mitigating evidence at a capital sentencing hearing. In *Burger* v. *Kemp*, 483 U. S. 776, 788 (1987), we did the same when presented with a challenge to counsel's decision at a capital sentencing hearing not to offer any mitigating evidence at all.

We hold, therefore, that the state court correctly identified the principles announced in *Strickland* as those governing the analysis of respondent's claim. Consequently, we find no merit in respondent's contention that the state court's adjudication was contrary to our clearly established law. Cf. *Williams*, 529 U. S., at 405 ("The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed'" (quoting Webster's Third New International Dictionary 495 (1976))).

### III

The remaining issue, then, is whether respondent can obtain relief on the ground that the state court's adjudication of his claim involved an "unreasonable application" of *Strickland*. In *Strickland* we said that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U. S., at 689. Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a defendant must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Ibid.* (quoting *Michel* v. *Louisiana*, 350 U. S. 91, 101 (1955)).

For respondent to succeed, however, he must do more than show that he would have satisfied *Strickland*'s test if his

claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. See *Williams, supra,* at 411. Rather, he must show that the Tennessee Court of Appeals applied *Strickland* to the facts of his case in an objectively unreasonable manner. This, we conclude, he cannot do.

Respondent's counsel was faced with the formidable task of defending a client who had committed a horribly brutal and senseless crime against two elderly persons in their home. He had just the day before shot a police officer and an unarmed civilian, attempted to shoot another person, and committed a robbery. The State had near conclusive proof of guilt on the murder charges as well as extensive evidence demonstrating the cruelty of the killings. Making the situation more onerous were the facts that respondent, despite his high intelligence and relatively normal upbringing, had turned into a drug addict and had a history of robbery convictions.

Because the defense's theory at the guilt phase was not guilty by reason of insanity, counsel was able to put before the jury extensive testimony about what he believed to be the most compelling mitigating evidence in the case—evidence regarding the change his client underwent after serving in Vietnam; his drug dependency, which apparently drove him to commit the robbery in the first place; and its effects. Before the state courts, respondent faulted his counsel for not recalling his medical experts during the sentencing hearing. But we think counsel reasonably could have concluded that the substance of their testimony was still fresh to the jury. Each had taken the stand not long before, and counsel focused on their testimony in his guilt phase closing argument, which took place the day before the sentencing hearing was held. Respondent's suggestion that the jury could not fully consider the mental health proof as

potentially mitigating because it was adduced during the guilt phase finds no support in the record. Defense counsel advised the jury that the testimony of the experts established the existence of mitigating circumstances, and the trial court specifically instructed the jury that evidence of a mental disease or defect insufficient to establish a criminal defense could be considered in mitigation. Tr. 2221.

Respondent also assigned error in his counsel's decision not to recall his mother. While counsel recognized that respondent's mother could have provided further information about respondent's childhood and spoken of her love for him, he concluded that she had not made a good witness at the guilt stage, and he did not wish to subject her to further cross-examination. Respondent advances no argument that would call his attorney's assessment into question.

In his trial preparations, counsel investigated the possibility of calling other witnesses. He thought respondent's sister, who was closest to him, might make a good witness, but she did not want to testify. And even if she had agreed, putting her on the stand would have allowed the prosecutor to question her about the fact that respondent called her from the Todds' house just after the killings. After consulting with his client, counsel opted not to call respondent himself as a witness. And we think counsel had sound tactical reasons for deciding against it. Respondent said he was very angry with the prosecutor and thought he might lash out if pressed on cross-examination, which could have only alienated him in the eyes of the jury. There was also the possibility of calling other witnesses from his childhood or days in the Army. But counsel feared that the prosecution might elicit information about respondent's criminal history.[5]

---

[5] Respondent cites *Cozzolino* v. *State*, 584 S. W. 2d 765 (Tenn. 1979), to argue that calling additional witnesses would not have opened the door to evidence about his prior bad acts. We need not express any view as to Tennessee law on this issue except to point out that *Cozzolino* does not state such a broad, categorical rule. *Cozzolino* held that a trial court

He further feared that testimony about respondent's normal youth might, in the jury's eyes, cut the other way.

Respondent also focuses on counsel's decision to waive final argument. He points out that counsel could have explained the significance of his Bronze Star decoration and argues that his counsel's failure to advocate for life in closing necessarily left the jury with the impression that he deserved to die. The Court of Appeals "reject[ed] out of hand" the idea that waiving summation could ever be considered sound trial strategy. 243 F. 3d, at 979. In this case, we think at the very least that the state court's contrary assessment was not "unreasonable." After respondent's counsel gave his opening statement discussing the mitigating evidence before them and urging that they choose life for his client, the prosecution did not put on any particularly dramatic or impressive testimony. The State's witnesses testified rather briefly about the undisputed facts that respondent had prior convictions and was evading arrest.

When the junior prosecutor delivered a very matter-of-fact closing that did not dwell on any of the brutal aspects of the crime, counsel was faced with a choice. He could make a closing argument and reprise for the jury, perhaps in greater detail than his opening, the primary mitigating evidence concerning his client's drug dependency and posttraumatic stress from Vietnam. And he could plead again for life for his client and impress upon the jurors the importance of what he believed were less significant facts, such as the Bronze Star decoration or his client's expression of remorse. But he knew that if he took this opportunity, he would give the lead prosecutor, who all agreed was very persuasive, the

---

erred in admitting evidence that the defendant committed crimes *after* the murder because that evidence was not relevant to any aggravating factors or mitigating factors raised by the defense. *Id.*, at 767–768. In this case, at a minimum, any evidence about respondent's *prior* robbery convictions would have been relevant because the State relied on those convictions to prove an aggravating circumstance.

chance to depict his client as a heartless killer just before the jurors began deliberation. Alternatively, counsel could prevent the lead prosecutor from arguing by waiving his own summation and relying on the jurors' familiarity with the case and his opening plea for life made just a few hours before. Neither option, it seems to us, so clearly outweighs the other that it was objectively unreasonable for the Tennessee Court of Appeals to deem counsel's choice to waive argument a tactical decision about which competent lawyers might disagree.

We cautioned in *Strickland* that a court must indulge a "strong presumption" that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight. 466 U. S., at 689. Given the choices available to respondent's counsel and the reasons we have identified, we cannot say that the state court's application of *Strickland*'s attorney-performance standard was objectively unreasonable. The judgment of the Court of Appeals is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, dissenting.

In my judgment, the Court of Appeals correctly concluded that during the penalty phase of respondent's capital murder trial, his counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." *United States* v. *Cronic,* 466 U. S. 648, 659 (1984). Counsel's shortcomings included a failure to interview witnesses who could have provided mitigating evidence; a failure to introduce available mitigating evidence; and the failure to make any closing argument or plea for his client's life at the conclusion of the penalty phase. Furthermore, respondent's counsel was, subsequent to trial, diagnosed with a mental illness that ren-

dered him unqualified to practice law, and that apparently led to his suicide. See App. 88–89. These circumstances "justify a presumption that respondent's conviction was insufficiently reliable to satisfy the Constitution." *Cronic*, 466 U. S., at 662.

I

Certain facts about respondent, Gary Cone, are not in dispute. Cone was a "gentle child," of exceptional intelligence, with an outstanding academic record in high school. App. 62–63. His father was an officer in the United States Army and a firm disciplinarian. He apparently enjoyed a loving relationship with his older brother and with both of his sisters. At age 8 or 9, however, Cone witnessed the drowning of his older brother. In 1966, at age 18, Cone enlisted in the Army and was sent to Germany. He was eventually transferred to Vietnam, where he served as a supply clerk until 1969. His service in Vietnam involved, among other things, transporting corpses and performing long hours of guard duty. He was awarded the Bronze Star, and he received an honorable discharge.

After returning to the States, Cone graduated from college and, although accepted into law school for August/ September 1980, never enrolled. According to Cone, he began to use drugs—mainly amphetamines—while in Vietnam, in order to perform extended guard duties, and he continued to do so after his discharge from the Army. In an apparent effort to fund this growing drug habit, he committed robberies, and, in 1972, after college, he was convicted of armed robbery and incarcerated in Oklahoma until 1979. While he was in prison, his father died and his fiancée, whom he met while in college, was raped and murdered. After his release from prison, he kept in touch with his mother (who lived in Arkansas) and his sister (who lived in Chicago), but did not stay in one place. The lack of evidence of gainful employment post-1979, coupled with evidence of travels to

Florida and Hawaii, suggests that Cone supported himself and his drug habit by criminal activity.

The Court has fairly described the facts of respondent's crime. *Ante,* at 689–690. However, in order to understand both why *Cronic* applies in the present case, and how counsel completely failed respondent at the penalty phase, I describe the events at trial in more detail. In his opening statement at the guilt phase of the trial, respondent's counsel, John Dice, admitted to the jury that Cone had committed the crimes for which he was charged, but explained that he was not guilty by reason of insanity—a condition brought on by excessive drug use that resulted from "Vietnam Veterans Syndrome." See, *e. g.,* Tr. 956–957.[1] Dice explained to the jury that Cone's time in Vietnam had transformed him, leading to his insanity, and Dice promised several witnesses in aid of this insanity defense, including Cone's sister Susan, Cone's mother, and his two aunts, all of whom would "testify about the Gary Cone that they knew," *id.,* at 953, that is, the

---

[1] Dice claims credit for developing this defense, but these claims are unsubstantiated and appear exaggerated from Dice's testimony. See State Postconviction Tr. 92. Nonetheless, such a defense was in its early stages at the time of respondent's 1982 trial, and has become more widely asserted. See generally Levin, Defense of the Vietnam Veteran with Post-Traumatic Stress Disorder, 46 Am. Jur. Trials 441 (1993 and Supp. 2001). Furthermore, as of 1980, the American Psychiatric Association began formally to recognize posttraumatic stress disorder (PTSD), which can derive from disturbing war experiences. See American Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders 463–468 (rev. 4th ed. 2000).

The PTSD from which respondent allegedly suffered would sensibly have been used by Dice as mitigation in the penalty phase. See Levin, 46 Am. Jur. Trials § 37. However, its viability as the guilt phase defense in this case was unlikely at best, because insanity in this context applies when "[t]he veteran who believes he is again in combat . . . attacks one whom he believes to be an enemy soldier." Davidson, Note, Post-Traumatic Stress Disorder: A Controversial Defense for Veterans of a Controversial War, 29 Wm. & Mary L. Rev. 415, 424 (1988). Cone was not in combat and his crime did not fit this description.

pre-Vietnam Cone. Dice also advised the jury that he would prove that the victim's sister had written a letter of forgiveness to Cone's mother—"one of the most loving letters I've ever read in my life," in Dice's words. *Id.*, at 965–966.[2]

Despite these promises, after the State's affirmative case in the guilt phase, Dice presented only three witnesses in support of the insanity defense: Cone's mother testified about his behavior after his return from Vietnam, but the court largely precluded her from discussing Cone's pre-Vietnam life; a clinical psychologist testified about posttraumatic stress resulting from Cone's Vietnam service; and a neuropharmacologist testified about Cone's drug use and its effects. Through these witnesses, Dice attempted to paint a picture of a normal person who fell victim to "amphetamine psychosis" and became a "junkie of such unbelievable proportions that it would have been impossible for him to form any intent." *Id.*, at 957. Cone was not a witness at the guilt phase, though he did take the stand outside the presence of the jury to waive his right to testify.

In its rebuttal case, the State adduced the testimony of Aileen Blankman, whom Cone visited in Florida approximately one day after the murders. She testified that respondent neither used drugs while visiting her, nor appeared to have recently used drugs, thereby calling into question his claim of drug addiction. According to Dice's co-counsel, Blankman's testimony "utterly destroyed our defense. We were totally unprepared for that." State Postconviction Tr. 42. Dice knew of Blankman's contact with Cone after the murders, and was "absolutely" aware that Blankman was

---

[2] This letter's mitigating effect would have been significant. It read, in part: "Even tho I am still in shock over the tragic death of my dear brother and his wife, I want you to know that you and your family have my prayers and deepest sympathy. I am also praying for Gary. We know he must have been out of his mind to have done the things he did. May God forgive him." Record, Exh. 29. See Tr. 1280–1281 (referencing letter, marked as Exhibit 29, which was never submitted to the jury).

a possible prosecution witness, but Dice failed to interview her before the trial. *Id.*, at 138.[3] In guilt phase rebuttal, the State also introduced its own medical experts to challenge the defense experts' testimony concerning Cone's alleged insanity. Although the State's experts questioned Cone's claim of Vietnam Veterans Syndrome, their testimony focused on Cone's failure to satisfy the insanity standard. See Tr. 1957, 1983. It took less than two hours for the jury to return a guilty verdict on all counts.

Dice's stated attitude toward the penalty phase must frame our consideration of the constitutional standard applicable to this case. Once his "Vietnam Veterans Syndrome" defense was rejected in the guilt phase, it appears that Dice approached the penalty phase with a sense of hopelessness because his "basic tactic was to try to convince the jury that Gary Cone was insane at the time of the commission of these acts, and the jury rejected that." State Postconviction Tr. 109. Dice perceived that the guilt phase evidence concerning Cone's mental health "made absolutely no difference to the jury," *id.*, at 159, and that the jurors "weren't buying any of it," *id.*, at 156, even though that evidence had been introduced to the jury through the lens of the insanity defense, not as mitigation for the death penalty.[4] Dice's co-

_____

[3] With respect to this failure, Dice explained: "So, we could have interviewed her, but we didn't. I don't know, maybe she was devastating and maybe she wasn't, but let's say that we had interviewed her, you know, what would it have changed? If she'd come up here and she'd testified, she would have testified the same way I assume." State Postconviction Tr. 140.

[4] It is true that the jury was instructed to consider mitigation from the guilt phase, and also true that Dice's brief penalty phase opening referenced the mental health evidence from the guilt phase, *ante*, at 691, but the jury's whole view of that testimony was influenced by its relation to the debunked insanity defense. Although the State's experts may have been successful in undermining Cone's claim to insanity, they did not necessarily undermine the potential mitigating effect of Cone's mental health evidence.

counsel echoed the sentiment that death was a foregone conclusion: "I don't recall too much on any discussion, really, about the penalty stage, mainly because my own feeling about the case law as it was then, and I guess as it still is, is that when a jury is [*Witherspoon*ed] in,[5] it's a fixed jury. They're going to find a death penalty. . . . It was almost a hopeless feeling that the way the problem was going to be solved was through the Court of Appeals, not through any jury verdict." *Id.*, at 39. Indeed, Dice expressed this hopelessness even before the trial began; he testified that he told Cone's mother "the first day I met her, that if [the prosecutor] does not elect to offer life in this case, your boy is going to the chair and there's not going to be a darn thing . . . I'm going to be able to do to stop it except to maybe screw up the prosecution." *Id.*, at 108. Moreover, Dice's testimony in state postconviction reveals his "radical" view of the penalty phase. *Id.*, at 122. When asked if the purpose of the penalty phase was to "individualize the defendant," Dice replied "[t]hat's your view of it as a lawyer, not mine," *id.*, at 124, and when asked why a capital proceeding is bifurcated, Dice replied "God only knows," *id.*, at 125.[6] His co-counsel's postconviction testimony confirms Dice's misguided views. Discussing the penalty phase, co-counsel stated: "I don't believe I understood the separate nature of it. I don't believe that I understood the necessity . . . of perhaps producing

---

[5] Her comments refer to *Witherspoon* v. *Illinois*, 391 U. S. 510, 518 (1968) (finding no general constitutional bar to a State's "exclusion of jurors opposed to capital punishment," *i. e.*, "death-qualification" of a jury, because of no proof that such a bar "results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction").

[6] Dice's comments concerning the penalty phase are not only erroneous in content, but inappropriate in tone. For example, when asked about capital sentencing, he rejected the notion that the Constitution requires an individualized death penalty decision: "The reason's political as far as I'm concerned. The method is insanity . . . . I don't care whether it's legal or not. When you kill people who kill people to show that killing people is wrong, it's insane." State Postconviction Tr. 124.

more evidence in mitigating circumstances, in that phase also." *Id.*, at 49.

The parties agree that Dice did four things in the penalty phase. See Brief for Respondent 36. First, he made a brief opening argument in the penalty phase asking for mercy. Second, in this opening, he referenced the evidence concerning Vietnam Veterans Syndrome that had been presented in the guilt phase. Third, he brought out on cross-examination of the State's witness who presented court records of respondent's prior convictions that Cone had been awarded the Bronze Star in Vietnam, though he did not explain the significance of that decoration to the jury because he made no closing remarks after the cross-examination. And, fourth, outside of the jury's presence, he successfully objected to the State's introduction of two photographs of the murder victims. Aside from doing these things, however, Dice did nothing before or during the penalty phase—he did not interview witnesses aside from those relevant to the guilt phase; he did not present testimony relevant to mitigation from the witnesses who were available; and he made no plea for Cone's life or closing remarks after the State's case.

Dice conceded that he did not interview various people from Cone's past, such as his high school teachers and classmates, who could have testified that Cone was a good person who did not engage in criminal behavior pre-Vietnam. Dice agreed that such witnesses would likely have been available if Dice had, in his words, "been stupid enough to put them on." State Postconviction Tr. 104. Apparently, Dice did not interview these individuals in preparation for the penalty phase, because he assumed that the State's cross-examination of those witnesses would emphasize the seriousness of Cone's post-Vietnam criminal behavior. *Id.*, at 104–105, 137. Dice's reasoning is doubtful to say the least because, regardless of the state of Tennessee law, see *ante*, at 696, n. 3, these post-Vietnam crimes were already known to the jury through the State's penalty phase evidence of

respondent's prior convictions.  Further, it is hard to imagine how evidence of Cone's post-Vietnam behavior would change their assessments—indeed, Dice's whole case was that Cone had changed.[7]

Dice also failed to present to the jury mitigation evidence that he did have on hand.  He admitted that other witnesses—including those whose testimony he promised to the jury in the guilt phase opening, such as Cone's mother, sister, and aunts—had been interviewed and were available to testify at the penalty phase.  Dice had ready access to other mitigation evidence as well: testimony from Cone himself (in which he could have, among other things, expressed remorse and discussed his brother's drowning and his fiancée's murder), the letter of forgiveness from the victim's sister, the Bronze Star, and the medical experts.  Dice's *post hoc* reasons for not putting on these additional witnesses and evidence are puzzling, but appear to rest largely on his incorrect assumption that the guilt phase record already included "what little mitigating circumstances we had," State Postconviction Tr. 133, and his fear of the prosecutor, "who by all accounts was an extremely effective advocate," *ante*, at 692; see, *e. g.*, State Postconviction Tr. 105, 107–108, 123, 136, 137.

---

[7] The Court's brief descriptions of Dice's reasoning for his choices, see *ante*, at 699–702, gives this reasoning more legitimacy than it merits.  Only by reading Dice's lengthy answers from the postconviction hearing is it clear how confused and misguided Dice was.  For example, with respect to the supposed damage that these mitigation witnesses could do, Dice speaks in generalities about unsubstantiated fears: "Picture this scenario.  You've got them on the stand; once you've put on this trial for life, as we call it, you and I, and the burden is what now?  It's only preponderance of the evidence.  Comes now the skilled prosecutor, Mr. Strother, over there, and says, oh, he was a good student in high school; right?  And Vietnam affected his mind; right?  What about all the robberies he pulled?  They have him in prison in Oklahoma.  I mean, he was in prison once.  Did you know about those things?  And how about this and that, you know, and other things Mr. Cone told me about? "  State Postconviction Tr. 104–105.

Although the guilt phase evidence included information about Cone's post-Vietnam behavior, it told the jury little about Cone's earlier life.[8]  During the guilt phase, Dice had a difficult enough time convincing the court to allow him to present evidence of respondent's post-Vietnam behavior and drug addiction as an insanity defense, that he did not seriously attempt to introduce evidence of respondent's childhood.  However, such evidence would have been permissible mitigation in the penalty phase.  This evidence would have revealed Cone to be "a quiet, studious child," with "absolutely no suggestion of any behavioral disturbance, even in adolescence."  App. 93.  Indeed, his mother could have described him as a "perfect" child, *ibid.*, and she "absolutely" wanted to testify at the penalty hearing to make a plea for Cone's life, but Dice "wouldn't put her on even if she'd wanted to," because he "did not feel that she did well on the stand," and because of "the cross-examination skills of the District Attorney involved."  State Postconviction Tr. 97–98, 193.  Dice's claim that she had not made a good witness at the guilt phase, see *ante*, at 700, is contradicted by the transcript of her straightforward trial testimony, Tr. 1631–1656, and his desire not to subject her to cross-examination is surely an insufficient reason, absent more, to prevent her from asking the jury to spare her son's life.

Dice also did not call as witnesses in mitigation either of Cone's sisters or his aunt, all of whom were promised in Dice's opening statement.  Dice's statement that Cone's sister Sue "did not want to testify," *ante*, at 700, is contradicted by his opening statement.  And his fear that she might have been questioned "about the fact that [Cone] called her from the [victims'] house just after the killings," *ibid.*, is unfounded: Evidence of this call was already in the record, and further reference to the call could do no conceivable additional harm to Cone's case.  Indeed, Dice's justification for

---

[8] Cf. Levin, 46 Am. Jur. Trials § 37 ("Counsel needs to clearly draw the contrast in the client from before and after Vietnam").

not calling Sue merely illustrates Dice's extraordinary fear of his adversaries. Dice's explanation for his failure to call Cone's other sister, Rita, is even more unsatisfying: "I think that we had a letter exchange or a phone call. My tactics do not necessarily involve putting the family on down here because, again, . . . I thought that we were in a position which we should say was tenuous from the outset." State Postconviction Tr. 136. His failure to call Cone's aunt is unexplained. His failure to offer into evidence the letter written by the victim's sister, offering her prayers for Cone, is also unexplained. See n. 2, *supra*.

Dice did not put Cone on the stand during the penalty phase, forfeiting the opportunity for him to express the remorse he apparently felt, see Tr. 1675. Dice testified that he discussed with Cone the possibility of testifying, but opted not to call him at the penalty phase because of fear that respondent might "lash out if pressed on cross-examination." *Ante*, at 700. He also claimed that Cone made the decision not to testify at the penalty phase because Cone feared the prosecutor. In Dice's words, Cone "realized that [the prosecutor] was a very intelligent and skilled cross-examiner and [Cone] felt that he would go off if he took the stand." State Postconviction Tr. 103. However, this explanation conspicuously echoes Dice's *own* fears about the prosecutor's prowess. Furthermore, respondent testified that Dice never "urged [him] as to the importance of testifying at the penalty stage," *id.*, at 204, and Dice testified that his duties did not include urging Cone to testify, *id.*, at 119. Given the undisputed evidence of Cone's intelligence and no indication that his behavior in the courtroom was anything but exemplary, it is difficult to imagine why any competent lawyer would so readily abandon any effort to persuade his client to take the stand when his life was at stake. Dice's claim that he did no more than permit Cone to reach his own decision about testifying in the penalty phase is simply not credible. Rather, it appears that Dice, fearful of the prosecutor, did not specifically discuss testifying in the penalty

phase with Cone, but rather discussed with him the possibility of taking the stand on only one occasion—during the guilt phase of the trial.[9]

Dice's failure to recall the medical experts who testified in the guilt phase is a closer question, and may have been justified by his belief that they could not add anything that had not already been presented to the jury.[10] Nevertheless, had they been called, Dice could have made the point, likely lost on the jury as a result of Dice's "strategy," that the experts' appraisal of Cone had mitigating significance, even if it did not establish his insanity. For there is a vast difference between insanity—which the defense utterly failed to prove—and the possible mitigating effect of drug addiction incurred as a result of honorable service in the military. By not emphasizing this distinction, Dice made it far less likely that the jury would treat either the trauma resulting from Cone's tour of duty in Vietnam[11] or other traumatic events in his

---

[9] This conclusion follows from Cone's testimony that he was only consulted once, in a three-person conference, about testifying, before he got on the stand to state that he would not be testifying. State Postconviction Tr. 203–204. Cone initially recalled that this meeting occurred in the penalty stage, though he then expressed uncertainty on this point; however, he remained certain that there had been only one meeting. See ibid. The conference must have concerned the guilt phase, because it was during the guilt phase that Cone waived his right to testify. See Tr. 1865–1866. Furthermore, Dice's co-counsel does not remember a discussion concerning Cone's possible testimony at the penalty phase, State Postconviction Tr. 35, 48; Dice himself testified repeatedly that Cone does not lie, id., at 117, 120, 139, 141; and Dice himself was unable to state for certain that Cone was consulted about penalty phase testimony, id., at 118.

[10] Indeed, had counsel's performance not been so completely deficient, this would be the sort of strategic choice about which counsel would be owed deference under Strickland v. Washington, 466 U. S. 668, 689 (1984). In this case, however, because of Dice's total failure in the penalty phase, it is difficult to credit even arguably reasonable choices as the result of "reasonable professional judgment," id., at 690. See infra, at 717–718.

[11] "Although not a combat soldier in Vietnam, Gary described disturbing and traumatic experiences while there. For example, the stench from the corpses, and the way in which they were stored in refrigerators alongside

life[12] as mitigating. And, again, the reason for Dice's failure is that Dice himself failed to appreciate this distinction, for he believed that the "jury had completely rejected" the experts' testimony after losing at the guilt phase. *Id.*, at 156.

In addition to performing no penalty phase investigation and failing to introduce available mitigation, Dice made no closing statement after the State's affirmative case for death. Rather, Dice's "strategy" was to rely on his brief penalty phase opening statement. This opening statement did refer to the evidence of drug addiction and the expert testimony already in the record, though it is unclear to what end, as Dice believed that the jury had "completely rejected" this testimony, *ibid.* Dice's statement also explained that respondent's drug abuse began under the "stress and strain of combat service," Tr. 2118, even though the jurors knew that Cone had not been in combat. Otherwise, Dice failed to describe the substantial mitigating evidence of which he was aware: Cone's Bronze Star; his good character before entering the military; the deaths in his family; the rape and murder of his fiancée; and his loving relationships with his mother, his sisters, and his aunt. At best, Dice's opening statement and plea for Cone's life was perfunctory; indeed, it occupies only 4½ of the total 2,158 trial transcript pages.

Dice's decision not to make a closing argument was most strongly motivated by his fear that his adversary would make a persuasive argument depicting Cone as a heartless

---

food; witnessing death; being required, even on occasion to fire a weapon; the long hours of guard duty; and the escalating drug abuse, often ostensibly sanctioned by superior officers." App. 96.

[12] According to a defense psychologist's report about Cone, the major traumas in his life have been: "witnessing his brother's body being removed from the lake"; "[h]is grandmother's death, just after high school graduation. Gary lived with her, and clearly viewed her as a safe haven from his father"; "[d]uty in Vietnam, 1968–1969. Although not a combat soldier, experiences were beyond the realm of normal experiences for a 20-year-old"; and the "[r]ape and murder of his fiancée in December 1972." *Id.*, at 102.

killer. At all costs, Dice wanted to avoid the prosecutor "slash[ing] me to pieces on rebuttal," as "[h]e's done . . . a hundred times." State Postconviction Tr. 123. Dice hoped that by not making a closing statement, the prosecutor would "kind of follo[w] me right down the primrose path." *Id.*, at 107. Of course, at the time Dice waived closing argument, the aggravating circumstances had already been proved, and Dice knew that the judge would instruct the jury to return a verdict of death unless the jurors were persuaded that the aggravating circumstances were outweighed by mitigating evidence. Perhaps that burden was insurmountable, but the jury must have viewed the absence of any argument in response to the State's case for death as Dice's concession that no case for life could be made. A closing argument provided the only chance to avoid the inevitable outcome of the "primrose path"—a death sentence.[13]

Both of the experienced criminal lawyers who testified as expert witnesses in the state postconviction proceedings refused to state categorically that it would never be appropriate to waive closing argument, to fail to put the defendant on the stand during the penalty phase of the trial, or to offer no mitigating evidence in the penalty phase. Both witnesses agreed, however, that Dice's tactical decisions were

---

[13] In his postconviction testimony, Dice offered another reason for waiving closing argument. He claimed that the State, in its penalty phase case, had "screw[ed] up the aggravated circumstances" by arguing to the jury an aggravating factor that was unsupported by the evidence—that the lives of two or more people other than the victims were endangered by the defendant. State Postconviction Tr. 108. Dice testified that he was concerned that if he made a closing argument, the State might realize its mistake and correct the error in its rebuttal closing argument. See *id.*, at 103–104. Not only is Dice's explanation incredible, but, unsurprisingly, Dice's "strategy" did not work "perfectly," as Dice claimed it did, *id.*, at 103, because the State Supreme Court found any error concerning the aggravators to be harmless, *State* v. *Cone*, 665 S. W. 2d 87, 95 (Tenn. 1984). More importantly, such a "strategy" is never appropriate; counsel's hope for an appellate victory concerning one trial error cannot justify abdication of his duty as advocate for the remainder of the proceeding.

highly abnormal, and perhaps unprecedented in a capital case.

## II

On these facts, and as a result of Dice's overwhelming failure at the penalty phase, the Court of Appeals properly concluded that *Cronic* controls the Sixth Amendment claim in this case, and that prejudice to respondent should be presumed. Given Dice's repeated and unequivocal testimony about Cone's truthfulness, together with Cone's apparent feelings of remorse, see Tr. 1675, Dice's decision not to offer Cone's testimony in the penalty phase is simply bewildering. And his decisions to present no mitigation case in the penalty phase,[14] and to offer no closing argument in the face of the prosecution's request for death,[15] are nothing short of incredible. Moreover, Dice's explanations for his decisions not only were uncorroborated, but were, in my judgment, patently unsatisfactory. Indeed, his rambling and often incoherent descriptions of his unusual trial strategy lend strong support to the Court of Appeals' evaluation of this case and its decision not to defer to Dice's lack of meaningful participation in the penalty phase as "strategy." [16]

Although the state courts did not have the benefit of evidence concerning Dice's mental health, it appears from Dice's

---

[14] Cf. *Penry* v. *Lynaugh,* 492 U. S. 302, 319 (1989) ("If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, 'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse'" (quoting *California* v. *Brown,* 479 U. S. 538, 545 (1987) (O'CONNOR, J., concurring))).

[15] Cf. *Herring* v. *New York,* 422 U. S. 853, 862 (1975) ("In a criminal trial, which is in the end basically a factfinding process, no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment").

[16] Dice's main explanation of his decision to waive closing argument at the close of the penalty hearing is quoted in an appendix to this opinion.

medical records that he suffered from a severe mental impairment. He began treatment for this illness a couple of years after trial, and he committed suicide approximately six months after the postconviction hearing in this case. See App. 88–89. The symptoms of his disorder included "confused thinking, impaired memory, inability to concentrate for more than a short period of time, paranoia, grandiosity, [and] inappropriate behavior." *Id.*, at 88. While these mental health problems may have onset after Cone's trial, a complete reading of the trial transcript and an assessment of Dice's actions at trial suggest this not to be the case.

A theme of fear of possible counterthrusts by his adversaries permeates Dice's loquacious explanations of his tactical decisions. But fear of the opponent cannot justify such absolute dereliction of a lawyer's duty to the client—especially a client facing death. For "[t]he very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." *Herring* v. *New York*, 422 U. S. 853, 862 (1975). There may be cases in which such timidity is consistent with a "meaningful adversarial testing" of the prosecution's case, *Cronic*, 466 U. S., at 659, but my examination of the record has produced a firm conviction that this is not such a case.

The Court claims that *Cronic*'s second prong only applies when "counsel failed to oppose the prosecution throughout the sentencing proceeding *as a whole*." *Ante*, at 697 (emphasis added). But that is exactly what Dice did. It is true, as the Court claims, that respondent's complaints about Dice's performance can be framed as complaints about what Dice failed to do "at specific points," *ibid.* However, when those complaints concern "points" that encompass all of counsel's fundamental duties at a capital sentencing proceeding—performing a mitigation investigation, putting on available mitigation evidence, and making a plea for the defendant's life after the State has asked for death—counsel *has* failed

"entirely," *ibid.* (quoting *Cronic,* 466 U. S., at 659 (emphasis omitted)). The Court of Appeals' conclusion in this regard exemplifies a court's proper use of its judgment to recognize when failures "at specific points" amount to an "entir[e] fail-[ure]" within the meaning of *Cronic.* We recognized the importance of the exercise of such judgment in *Strickland* v. *Washington,* 466 U. S. 668 (1984), in which we explained that Sixth Amendment principles are "not . . . mechanical rules," and that "[i]n every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.,* at 698.

The majority also claims that *Cronic*'s second prong does not apply because this Court has previously analyzed claims "of the same ilk," *ante,* at 697, under *Strickland,* not *Cronic.* However, in none of our previous cases applying *Strickland* to a penalty phase ineffectiveness claim did the challenged attorney not only fail to conduct a penalty phase investigation, but also fail to put on available mitigation evidence and fail to make a closing argument asking to spare the defendant's life. See *Williams* v. *Taylor,* 529 U. S. 362 (2000); *Burger* v. *Kemp,* 483 U. S. 776 (1987); and *Darden* v. *Wainwright,* 477 U. S. 168 (1986). Furthermore, in none of these cases was there evidence that counsel had as "radical" a view of the penalty phase as Dice's, and in none of these cases was the lawyer's own mental health called into question, as it has been here. It is, of course, true that a "total" failure claim, which we confront here, could theoretically be analyzed under *Strickland.* However, as *Cronic* makes clear, see *ante,* at 695–696, although *Strickland could* apply in all Sixth Amendment right to counsel cases, it does not.

Moreover, presuming prejudice when counsel has entirely failed to function as an adversary makes sense, for three reasons. First, counsel's complete failure to advocate, coupled here with his likely mental illness, undermines *Strickland*'s

basic assumption: that counsel has "made all significant deci-
sions in the exercise of reasonable professional judgment."
466 U. S., at 690. Second, a proper *Strickland* inquiry is
difficult, if not impossible, to conduct when counsel has com-
pletely abdicated his role as advocate, because the abdication
results in an incomplete trial record from which a court can-
not properly evaluate whether a defendant has or has not
suffered prejudice from the attorney's conduct. Finally,
counsel's total failure as an adversary renders "the likelihood
that the verdict is unreliable" to be "so high that a case-
by-case inquiry is unnecessary." *Mickens* v. *Taylor, ante,*
at 166.

The Court's holding today is entirely consistent with its
recent decision in *Mickens*. In both cases, according to the
Court, a presumption that every lawyer in every capital case
has performed ethically, diligently, and competently is appro-
priate because such performance generally characterizes the
members of an honorable profession. It is nevertheless true
that there are rare cases in which blind reliance on that pre-
sumption, or uncritical analysis of a lawyer's proffered expla-
nations for aberrant behavior in the courtroom, may result
in the denial of the constitutional "right to the effective as-
sistance of counsel." *McMann* v. *Richardson*, 397 U. S. 759,
771, n. 14 (1970). The importance of protecting this right in
capital cases cannot be overstated.[17] Effective representa-

---

[17] A recent, comprehensive report issued by the Governor's Commission
reviewing Illinois' capital punishment system concluded: " 'Providing qual-
ified counsel is perhaps the most important safeguard against the wrongful
conviction, sentencing, and execution of capital defendants. It is also a
safeguard far too often ignored.' " Report of the Governor's Commission
on Capital Punishment 105 (2002) (quoting Constitution Project, Manda-
tory Justice: Eighteen Reforms to the Death Penalty 6 (2001)).

Members of this Court have similarly recognized both the importance
of qualified counsel in death cases, and the frequent lack thereof. See,
*e. g., McFarland* v. *Scott*, 512 U. S. 1256 (1994) (Blackmun, J., dissenting
from denial of certiorari) (describing the "crisis in trial and state postcon-
viction legal representation for capital defendants"); Lane, O'Connor Ex-

tion provides "the means through which the other rights of the person on trial are secured." *Cronic*, 466 U. S., at 653. For that reason, there is "a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable" whenever defense counsel "entirely fails to subject the prosecution's case to meaningful adversary testing." *Id.*, at 659. That is exactly what happened in the penalty phase of Gary Cone's trial.

I respectfully dissent.

## APPENDIX TO OPINION OF STEVENS, J.

Excerpt from Dice's postconviction testimony in which he explains his reasons for waiving closing argument:

"Q: While we're on that subject, will you summarize for us all the reasons that you had at that time, and not at this time, but at that time, for waiver of final argument in the penalty phase of the Cone matter?

"A: Okay. Number one; I thought that we had put on almost every mitigating circumstance that we had. Okay? In the first phase of the trial.

"Number two; I managed to sucker Mr. Patterson and Mr. Strother into putting on my Bronze Star decoration without having my defendant testify, which I felt was pretty good trial tactics. I know when I asked Mr. Blackwell that question, one of the two of them over there became unglued. Okay.

"Number three; I thought the trial judge had lost control of the case. He allowed Mr. Strother to call me unethical twice in front of the jury, and he did several things in there

---

presses Death Penalty Doubt; Justice Says Innocent May Be Killed, Washington Post, July 4, 2001, p. A1 (reporting JUSTICE O'CONNOR's comment that "Perhaps it's time to look at minimum standards for appointed counsel in death cases" and JUSTICE GINSBURG's comment that "I have yet to see a death case, among the dozens coming to the Supreme Court on the eve of execution petitions, in which the defendant was well represented at trial").

which had made my client extremely angry. I forgive Mr. Strother for that. I don't think he really believes it, but he's a trial lawyer and he took the position.

"Okay. I'm saying the general feeling of that was going— the trial was not being conducted neutrally by the judge. Okay.

"The other thing that got to me about the aspects of why to waive, I knew again that they were so much out for blood that they'd screw up their own trial in terms of what the jury was going to find.

"Okay. Another factor is that my defendant told me that he would probably explode on the stand with anger if General Strother cross-examined him, and I know Don Strother to be an extremely competent cross-examiner.

"Q: Just so we'll be clear now. I've asked you to name the reasons for waiving final argument. Was whether or not what you just said about Mr. Cone possibly exploding, did that have anything to do with waiving final argument?

"A: Absolutely it did. I didn't make that decision at the last moment at all, Mr. Kopernak. That decision was carefully planned out. When the jury was only out for an hour, when they were only out for an hour, and I think it was close to that, and long before the trial I considered that as a trial tactic. Now, all these factors were being considered, not just one.

"Q: Okay. Go ahead, please.

"A: Okay.

"Q: Do you want me to go over those so you'll— (Interrupted)

"A: No, because I recall most of them pretty clearly. You know, we'd had all those things go on, and some of the things which had happened in the trial, and when Ural Adams had done that in the Groseclose case and he and I had spent so much time talking about whether or not to do it, I considered

that perhaps because of the nature of the opposition in this particular case, that it might be an effective tactic. And I'll tell you this much. Let's say that when we'd gotten down there that Mr. Strother had gotten up and made the first argument, I might not have waived at all if I knew that Patterson was going to make the kill argument. I might not have made it. But once Patterson made the first argument, and then those statements that were reported in the press where Mr. Patterson said, well, we're here because it's wrong to kill people. I'll never forget that one as long as I live. Okay. When he made that portion in another portion of the trial. So, what I chose to do is to make my closing argument in my opening argument and then suckered them along because they'd already made that mistake, as far as I was concerned. Okay? And see whether or not the jury would take what little mitigating circumstances we had and give us a verdict and keep him alive." State Postconviction Tr. 130–133.