IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 20, 2002 Session

**STEVEN L. HASSELL v. STATE OF TENNESSEE**

**Direct Appeal from the Circuit Court for Hickman County
Nos. P-5013CRI, P-5018CRII, P-5070CRI     Russ Heldman, Judge**

---

**No. M2001-02888-CCA-R3-PC - Filed January 9, 2003**

---

The petitioner was originally convicted of first degree murder and attempted second degree murder and sentenced to an effective life term. He now appeals the denial of post-conviction relief, arguing trial counsel denied him the right to testify and ineffectively failed to present closing argument. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which DAVID H. WELLES and ALAN E. GLENN, JJ., joined.

John S. Colley, III, Columbia, Tennessee, for the appellant, Steven L. Hassell.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Ronald L. Davis, District Attorney General; and Michael Joseph (Jay) Fahey, II, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The petitioner is serving a life sentence for first degree premeditated murder and a concurrent ten-year sentence for attempted second degree murder. We affirmed the judgments on direct appeal. *See* State v. Steven L. Hassell, No. M1998-00063-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 266 (Tenn. Crim. App. Mar. 9, 2000, at Nashville). The following is a summary of the proof presented to the jury during his trial:

> On the night of October 26, 1996, defendant and his friend, William Frierson, attended a birthday party in their honor at the Rare Blood Motorcycle Club in Hickman County. Since the club remained open to the public, there were also people present who were not associated with the birthday party.

Around midnight, a minor altercation broke out on the dance floor. Defendant was not involved but his friend Frierson was. The confrontation seemed to end, and then resumed. Several witnesses testified that Anthony Vanleer, the murder victim, swung at Frierson. At this point, the club management turned on the lights, turned off the music, and ordered everybody to leave.

Timothy Vanleer, Anthony's brother, preceded Anthony out the front door of the club. As he looked out, he saw defendant running up the parking lot in a crouched position. Defendant held up a pistol, and Timothy turned to Anthony, who was behind him, and told him about the gun. He tried to push Anthony, and then felt a burning sensation in his side. By this time, he had heard a shot. A bullet had gone through Timothy, and he fell on his side. He heard two or three more shots, and as he looked back at his brother, he saw Anthony fall.

Timothy knew that Anthony usually carried a gun, and he saw Anthony's pistol when Anthony hit the ground. He got the gun and tried to pursue defendant, who was running in the parking lot. He was unable to catch defendant due to his wound, and returned to check on Anthony. When he realized that Anthony was seriously wounded, he went over to Anthony's Suburban truck and, when he grabbed the luggage rack, the gun went off, hitting the rack. Timothy then passed out.

Shawn L. Modena was behind Anthony as they walked out of the club. Modena testified that, as he walked out the door, he saw defendant standing ten to fifteen feet away with a pistol in his hand, pointed at the door. Modena retreated back into the club, and heard three gunshots: one followed by a short pause, and then two more.

Leroy Moss was sitting in his car in the parking lot while people were exiting the club. He testified that he saw defendant go to a car, open the door, reach inside, and then go to the middle of the parking lot. Moss testified that defendant then shot a pistol twice into the ground, at which point the crowd "dispersed." Timothy then came out of the club, and defendant fired again. When Anthony came out, according to Moss, defendant fired two or three more times. Moss saw Anthony turn and fall over. Moss then heard two or three louder shots coming from the corner of the building, and defendant ran off. Moss was "positive" that defendant was the initial shooter.

Torez Sowell was one of the workers at the club that night. After an unrelated dispute, Sowell escorted someone out of the club through the side door. As he was returning along the side of the building, he heard two shots. He ran to the corner and saw Anthony fall. He also saw defendant with a gun in front of the club. Defendant shot again, and Sowell saw Timothy trying to get to Anthony. He observed defendant preparing to shoot again, so he fired his .45 two or three times over defendant's head. Defendant took off running.

Frierson testified that Anthony had approached him in the club with one hand behind his back, causing him to worry that Anthony had a weapon. He did not see Anthony produce a weapon, however. Defendant had been standing next to Frierson when Anthony swung at him. Frierson was inside the club during the shooting and did not see what happened.

Clifton Brown testified that he left the club when Anthony swung at Frierson. He walked across the parking lot to the street where he was parked. He then saw defendant jogging down the road. Shortly thereafter, he saw defendant heading back to the club. He then heard five gunshots.

Monica McBride was in the parking lot during the shooting. She had been talking with a friend named "Jug" when she saw defendant walk up. She asked him where he was going, and he responded that he was preparing to leave, and wanted to check with Frierson inside the club to see what Frierson was going to do. She testified that, at this point, defendant did not have anything in his hand. She then saw Anthony coming out of the doorway, and he and defendant made eye contact. She testified that she saw Anthony tugging at the right side of his pants and then saw defendant pulling something out of his pants. At that point, she testified, Jug threw her onto the ground and laid on top of her. She heard two shots, and then heard some more shots. She then heard some louder shots from the side of the building. She later saw somebody over at the Suburban. She admitted that, on October 29, 1996, she had told the police that she had seen defendant pull out a gun, and then saw Anthony pulling at his shirt.

Bobby Sowell also worked at the club that night. He was behind Anthony as Anthony started out the front door. He testified that, as Anthony started out, he backed up and bumped into Sowell. Sowell saw Anthony reach back and pull his gun out of the back of his pants with his right hand. Sowell testified that Anthony held the

gun straight down behind him. Anthony headed out the door, and Sowell heard shots fired. He testified it was "kind of rapid shooting." He then heard more shots, but did not see who was firing them. Sowell saw Timothy kneel over Anthony, retrieve Anthony's gun, and take off. Later, he testified, he saw Timothy "kind of draped" over the Suburban with the gun in his hand, and the gun fired.

Dr. Charles Harlan performed the autopsy on Anthony, and testified that Anthony had died of a gunshot wound to the chest. He recovered the bullet from Anthony's body and turned it over to law enforcement. Robert Daniel Royse, a firearms examiner for the T.B.I., testified that the bullet recovered from Anthony's body had been fired from the same gun as a bullet recovered from the crime scene.

Steven L. Hassell, 2000 Tenn. Crim. App. LEXIS 266, at **2-7 (footnotes omitted).

## POST-CONVICTION HEARING

The petitioner filed the instant post-conviction relief action in which he alleged his trial counsel deprived him of the right to testify and deficiently failed to present a closing argument. During the post-conviction hearing, the petitioner testified his trial counsel waited until the end of his trial to discuss whether he would testify. He said he met with his attorney five or six times before his trial, and during those meetings trial counsel told him the state would use his prior criminal history against him if he testified. The petitioner said his prior criminal history consisted of charges brought against him in Maury County to which he pled guilty while awaiting trial in Hickman County.[1]

The petitioner testified he and trial counsel discussed his version of the events in question, but that she did not prepare him to testify. According to the petitioner, it was on the final day of his trial when his attorney asked him if he wanted to testify. He stated she did not tell him that he had the right to testify. He said he asked her for a prognosis of his trial, and she replied that "everything was looking all right." Trial counsel testified she did not recall this interchange. According to the petitioner, he wanted to testify, but declined because he was not prepared.

The petitioner testified his trial attorney did not present a closing argument. He stated that after she failed to do so, he realized he should have testified. According to the petitioner, his trial testimony would have been that he shot and killed victim Anthony Vanleer in self-defense. The petitioner stated he saw Anthony Vanleer pull out a gun. The petitioner said he thought Vanleer was going to shoot him, so he drew his own gun and fired two shots. The petitioner testified he shot one person and did not shoot Timothy Vanleer.

---

[1]The record does not reflect the nature of the offense or offenses.

The petitioner's grandmother, Ollie Gillespie, testified she was present during three meetings between the petitioner and his trial counsel, but spoke with trial counsel on numerous occasions. According to Gillespie, trial counsel stated she was not going to present the petitioner's testimony because it would harm his case. Gillespie testified she was not present during the last day of the petitioner's trial.

The petitioner's trial counsel testified at the post-conviction hearing that she and the petitioner had previously discussed whether he would testify, but the final decision was made during a brief conference just before the close of the petitioner's proof. Trial counsel stated she asked the petitioner if he was going to testify, and he "agreed" that he would not testify. She said that sometime after the defense had rested, the petitioner told her, "I'm still not sure about not testifying," to which she responded, "It's too late."

According to trial counsel, when the petitioner decided not to testify, he knew he could testify if desired and it was his decision not to testify. She stated she advised the petitioner of the advantages and disadvantages of testifying. She testified she had also given him general instructions on testifying, including the form of the questions she would ask, questions he could expect from the state, and advised him regarding his demeanor and to avoid rambling answers or volunteering information.

Trial counsel testified she advised the petitioner it would be best that he not testify. She stated she was concerned the petitioner's arrogant attitude and lack of remorse about Anthony Vanleer's death would harm his case. She said she was also concerned that he would not perform well during cross-examination. She testified she shared these concerns with the petitioner.

Trial counsel stated that the petitioner had entered pleas of *nolo contendere* to the Maury County charges pursuant to a diversion agreement, and the trial court ruled the convictions could not be used to impeach the petitioner. According to trial counsel, the petitioner was aware of the trial court's ruling when he made his decision not to testify.

She testified that she decided to forego closing arguments after the state's closing argument was not as strong as it could have been; she opined that the prosecutor's rebuttal argument had a tendency to be more forceful than the initial closing argument. She believed it was best not to give the state an opportunity to present a more effective closing argument during rebuttal. She further testified that she felt she had effectively cross-examined the state's witnesses and shown the jury the discrepancies in their testimony.

The post-conviction court fully accredited the testimony of trial counsel and found the petitioner was not deprived of his right to testify. It further found the petitioner failed to establish by clear and convincing evidence that, had he testified at trial in accordance with his testimony at the post-conviction hearing, the result at trial would have been different.

## I.  INEFFECTIVE ASSISTANCE OF COUNSEL - STANDARD OF REVIEW

When a claim of ineffective assistance of counsel is made under the Sixth Amendment, the burden is upon the complaining party to show (1) that counsel's performance was deficient, and (2) the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair.  *See* Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984).  Our supreme court has applied the Strickland standard to the right to counsel under Article I, Section 9 of the Tennessee Constitution.  *See* State v. Melson, 772 S.W.2d 417, 419 n. 2 (Tenn. 1989).

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court required that the services be rendered within the range of competence demanded of attorneys in criminal cases.  Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197 (D.C. Cir. 1973).   In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; s*ee* Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

It is unnecessary for a court to address deficiency and prejudice in any particular order, or even to address both if the petitioner makes an insufficient showing on either.  Strickland, 466 U.S. at 697, 104 S. Ct. at 2069.  In order to establish prejudice, the petitioner must establish a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999) (quoting Strickland, 466 U.S. at 694, 104 S.Ct. at 2068) (citations omitted).

The petitioner bears the burden of proving the factual allegations that would entitle petitioner to relief by clear and convincing evidence.  Tenn. Code Ann. § 40-30-210(f).  We review the post-conviction court's factual findings underlying a claim of ineffective assistance of counsel under a *de novo* standard with a presumption that those findings are correct – unless the preponderance of the evidence establishes otherwise.  Burns, 6 S.W.3d at 461.  However, the post-conviction court's conclusions of law –  such as whether counsel's performance was deficient or whether that deficiency was prejudicial –  are reviewed under a *de novo* standard with no presumption of correctness.  Fields v. State, 40 S.W.3d 450, 457 (Tenn. 2001) (citations omitted).

## II.  RIGHT TO TESTIFY

The petitioner complains he declined to testify because his trial counsel failed to prepare him to testify, did not seriously discuss his right to testify until the end of trial, and advised him not to testify.  The trial court accredited trial counsel's testimony in which she testified that the petitioner was aware of his right to testify, they discussed his potential testimony and its advantages and disadvantages prior to trial, and that the petitioner made the decision not to testify.  Questions concerning the credibility of witnesses and the weight and value to be given to their testimony are

resolved by the post-conviction court, not this court. Burns, 6 S.W.3d at 461. Trial counsel's testimony provided sufficient proof to support the trial court's implicit finding that the petitioner made an informed decision not to testify and, therefore, was not deprived of his right to do so. Further, we conclude trial counsel's recommendation to petitioner that he not testify was well within the range of competence for a criminal defense attorney.

We note that the petitioner's trial was held in 1997, before the publication of our state supreme court's decision in State v. Momon, 18 S.W.3d 152,162 (Tenn. 1999), upon which the petitioner relies. Momon established procedures for ensuring an accused's waiver of his right to testify is knowing, voluntary, and intelligent. *Id.* The requirements set forth in Momon are not retroactive and apply only to cases tried after it was decided. *Id.* at 163. Therefore, at the time of the defendant's trial, it was not necessary for trial counsel to comply with the procedural requirements mandated by Momon.

We question the correctness of the post-conviction court's additional ruling that the petitioner had not met his burden of establishing a reasonable probability that, had the petitioner testified at trial, the result would have been no different. If a petitioner has been deprived of the right to testify, the state must establish harmlessness beyond a reasonable doubt. *Id.* at 168. The post-conviction court did not utilize this standard in ruling on the prejudice issue. Nevertheless, we need not address prejudice in light of our finding that defendant was not deprived of his right to testify. *See* Strickland, 466 U.S. at 697, 104 S. Ct. at 2069.

## III. DECISION TO FOREGO CLOSING ARGUMENT

The petitioner contends the post-conviction court erred in failing to find trial counsel ineffective for waiving closing argument. Trial counsel testified she decided not to make a closing argument after the state's closing argument was less effective than it could have been. Based on her past experience, she concluded it was best not to give the prosecutors the opportunity to strengthen their closing argument during rebuttal. Further, she opined she had effectively made her points to the jury during her cross-examination of the state's witnesses.

The petitioner may not second-guess a reasonably based trial strategy; the petitioner may not criticize a sound, but unsuccessful, tactical decision made after adequate preparation for the case. Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see* Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). We conclude trial counsel made a reasonable tactical decision to forego a closing argument. *See* Bell v. Cone, 535 U.S. 685, __, 122 S. Ct. 1843, 1854, 152 L. Ed. 2d 914 (2002) (holding waiver of final argument during sentencing phase of Tennessee capital murder trial was reasonable tactical decision and did not constitute ineffective assistance of counsel). Further, it is our determination that the petitioner has failed to establish a reasonable probability that the result of the trial would have been any different had counsel made a closing argument.

Accordingly, we conclude the post-conviction court properly denied the petition for post-conviction relief and affirm the judgment of the post-conviction court.

_____
JOE G. RILEY, JUDGE