IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 7, 2005 Session

## CHARLES GOODE v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-26257    Arthur T. Bennett, Judge**

---

**No. W2004-01577-CCA-R3-PC  - Filed October 25, 2005**

---

Petitioner, Charles Goode, appeals the trial court's dismissal of his petition for post-conviction relief. In this appeal, Petitioner argues that his counsel's representation at trial was deficient because he failed to adequately investigate Petitioner's case and failed to effectively cross-examine the victim. After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID G. HAYES and ALAN E. GLENN, JJ., joined.

R. Price Harris, Memphis, Tennessee, for the appellant, Charles Goode.

Paul G. Summers, Attorney General and Reporter; Seth P. Kestner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Lee Coffee, Assistant District Attorney General, for the appellee, the State of Tennessee.

### OPINION

Following a jury trial, Petitioner was convicted of aggravated rape and was sentenced to twenty-five years in the Tennessee Department of Correction. This Court affirmed Petitioner's conviction and sentence in *State v. Charles Goode*, No. W2000-02267-CCA-R3-CO, 2001 WL 1042145 (Tenn. Crim. App., at Jackson, Sept. 10, 2001), *perm. to appeal denied* (Tenn. Dec. 31, 2001). The facts surrounding the offense were summarized by this Court as follows:

> In March 1999 Elizabeth Reed, the victim, was a resident of Mid-South Christian Nursing Home in Shelby County, Tennessee. She was seventy (70) years of age and had been crippled since birth due to cerebral palsy. Although she was able to feed and partially dress herself, she was not able to move on her own. She also could not participate in general activities, and was physically helpless. She had never lived alone, residing at home until her mother's death in 1980, and at Mid-South since that time.

The defendant was a charge nurse at Mid-South, and was one of several persons who regularly provided care to the victim. The victim testified that on the night of March 30, 1999, as she sat watching television, the defendant entered her room and announced that it was time for bed. He then lifted the victim, placed her in her bed, stripped her of her clothes, climbed on top of her, and digitally penetrated her vagina, causing her to bleed profusely. During these events he also kissed the victim on the mouth and told her he loved her. The victim testified that she did not consent to any of the defendant's actions.

At the conclusion of these events the defendant observed that the victim was bleeding, but told her that she would be all right. He began to change her bed linens, but was interrupted when another caregiver entered the room. He left without treating her injuries.

Roosevelt Nelson ["Rose"], a caregiver at the nursing home, testified that on March 30, 1999, [s]he was making regular rounds. When [s]he first entered the victim's room, the defendant, a nurse, was also in the room. He was stripping linens from the bed, a task he did not usually perform. Nelson offered to complete the task. The defendant accepted the offer and left the room. He offered no explanation about why the patient was bleeding.

Nelson stated that when [s]he entered the victim's bedroom [s]he was "kind of shocked," apparently because of the blood [s]he observed. Nelson took the victim out of bed, placed her in a wheelchair, and took her into the bathroom. The victim seemed unwilling to have Nelson touch her. Nelson observed that the victim was bleeding, and [s]he was unable to stop the flow of blood even after [s]he cleaned her. [S]he placed a pad on her to contain the bleeding.

When Nelson returned the victim to the bed and continued to change the bed linens, [s]he noticed that the fitted sheet normally placed over the mattress had been replaced by a flat sheet. The blue pad normally placed across the bed on top of the draw sheets was located under the flat sheet covering the mattress, and was soiled with blood.

Nelson then found the defendant, advised him that the victim was in pain, and asked him to administer pain medication. The defendant responded that he already had given her medication. The defendant did not provide any information about the victim's injuries.

Later the same evening the victim was hospitalized because of her injuries. She continued to bleed from her vaginal area.

Marie Fizer, the victim's older sister, testified that she was called about midnight and told of her sister's hospital admission. Because she did not drive at night, she was unable to get to the hospital until the next morning. When she did arrive, she found that the victim was very upset. The victim remained in the hospital for four days, and then was moved to a different nursing home because she was afraid to return to Mid-South.

Sally DiScenza, a forensic sexual assault nurse, was called to examine the victim one day after the assault. She testified that she observed an acute, recent hematoma around the vaginal area, and bruising on the upper inner thighs. The victim also had an acute laceration in the inner labia and vulva, caused by a sharp object. The victim stated that the defendant had digitally penetrated her. As a post-menopausal woman the victim was more prone to injury due to a lack of estrogen. Ms. DiScenza testified that the victim's injuries were definitely caused by trauma, and were consistent with sexual penetration. She also noted that although the victim was physically limited, she was alert, oriented, cooperative, and able to describe what had happened to her.

Ruth Boring, former charge nurse at the Mid-South Christian Nursing Home, testified for the defense. She stated that on approximately fifteen occasions over two or three years she had observed the victim engaged in sexual masturbation using the bristle end of a hairbrush. She acknowledged that she did not record or report these incidents to anyone at the time she observed them. She stated that she wished to preserve the victim's privacy. Boring also admitted that the victim had never exhibited any visible problems with her vaginal area. She acknowledged that she was fired from her position at Mid-South before this incident occurred.

*Goode*, 2001 WL 1042145, at \*1-2.

## I. Post-Conviction Hearing

Dr. Elbert Hines testified that he was the medical director of the Mid-South Christian Nursing Home at the time of the offense. His responsibilities included overseeing the patients' general health needs and treating them in time of acute illness. Dr. Hines said that he had known the victim for five years, and that he medically evaluated her at least once every sixty days. Dr. Hines said that the victim had suffered a fractured orbit when she fell out of her wheelchair in January 1999, but his records did not indicate any falls in March 1999, the date of the offense.

Dr. Hines was not on call when the victim was admitted to the hospital on March 30, 1999, but he saw the victim the following day. The victim told Dr. Hines that she had been sexually assaulted at approximately 10:00 p.m. the previous evening. The victim said that Petitioner had digitally penetrated her and caused her pain. Dr. Hines said that the victim had a two-inch laceration in the vaginal area and bruising which was consistent with a sexual assault.

Dr. Hines said that the victim had frequent urinary tract infections. Dr. Hines agreed that urinary tract infections could cause bleeding, but he could not recollect whether the victim had experienced bleeding as a result of her infections. Dr. Hines said that a Foley catheter had been inserted into the victim by the time he examined her, but the laceration was located one-half to one inch away from the catheter. Dr. Hines recalled that a medical report done at the time of the victim's admission to the hospital noted that the victim had also complained of rectal bleeding.

Dr. Hines said that he never talked to anyone from the public defender's office prior to trial. He did not remember, however, telling Lynn Davis, the director of nursing at the nursing home, that he had any doubts about the victim's explanation for her injuries.

On cross-examination, Dr. Hines said that the victim was bleeding profusely in the vaginal area at the time of her admission which was not consistent with the insertion of a catheter or any medication she was taking. Dr. Hines noted in his report that he did not believe that the victim's injuries were self-inflicted or could have been caused by a fall. Dr. Hines said the laceration was about two inches long and would have been too painful for the victim to inflict upon herself.

On redirect, Dr. Hines agreed that it was impossible to tell whether the bruises and laceration were incurred at the same time. He said that the victim had difficulty coordinating her movements.

Sally DiScenza, a nurse at the Sexual Assault Resource Center, saw the victim on March 31, 1999, at the request of the Memphis Police Department. She said that a rape kit was usually not prepared when the sexual abuse allegation was based on digital penetration. Ms. DiScenza said that she did not speak with anyone from the public defender's office prior to testifying at trial. On cross-examination, Ms. DiScenza said that the victim told her that Petitioner had penetrated her with his penis and ejaculated on March 26, 1999, but the incident was too far removed to be able to collect a sperm sample.

Petitioner said that he met with his counsel three or four times prior to trial. Petitioner said that counsel was not always on time for the meetings, and occasionally would miss a meeting. Petitioner said that he gave his counsel a list of witnesses, but counsel did not interview them. Petitioner said that Marilyn Malone, Loyce McCarthy and Judith Branch could have testified as character witnesses. He conceded, however, that none of them knew anything about the incident. Petitioner said that his counsel should have looked at his employment records and talked with other employees. Petitioner said that his counsel was not forceful enough during his cross-examination of the victim.

On cross-examination, Petitioner testified that he made the decision not to testify at trial because he felt that the jury had already made up its mind to return a verdict of guilty. Petitioner said that all of the State's witnesses lied at trial, but he did not know why they did so.

On redirect, Petitioner said that the victim often told "wild tales." He said that it made it appear that the victim could not walk when she testified from her wheelchair. Petitioner said that the victim could walk, and she "[put] on a good show" at trial.

Petitioner's counsel testified that he had been practicing law for twenty-two years, mostly with the public defender's office. He was Petitioner's third counsel, and began representing him on August 18, 1999. Counsel said that the State provided him with its discovery material, and he gave Petitioner copies of the documents.

Counsel said that he did not interview Ms. DiScenza prior to trial because he knew the scope of her testimony from her medical report. He said that a rape kit was not warranted when the sexual abuse was digital penetration. Counsel said that he interviewed the witnesses Defendant suggested, and Ms. McCarthy and Ms. Branch were not on the list. If they had been, he would have interviewed them. Ms. Boring was adamant that she had seen the victim masturbating with a hairbrush, so counsel felt that he had to put her on the stand. Counsel said that he sensed some hostility from the jurors during Ms. Boring's testimony. Counsel interviewed Ms. Malone who said that she had not seen anything occur in the victim's room on March 30, 1999. Moreover, Ms. Malone said that Ms. Boring's masturbation story was "preposterous," so counsel decided not to call her as a witness.

Counsel said that Petitioner told him that Petitioner had not seen the victim masturbating. Ms. Boring explained that she did not record the incidents on the victim's chart because she was afraid the victim's family would be upset if she did. Counsel said he did not ask for the victim's medical records because Petitioner told him there was nothing in the records to confirm Ms. Boring's testimony.

Counsel met more than thirteen times with Petitioner's wife. Counsel said she dropped by his office so frequently he stopped recording her visits. When counsel's investigator tried to interview Ms. Goode, however, her daughter became hysterical. Ms. Goode's daughter said that Petitioner had sexually abused her when she was ten. Counsel believed that the daughter had spent approximately six months in foster care as a result of the allegations, although Petitioner was never charged with sexual abuse.

Counsel said that according to his records he met with Petitioner thirteen times prior to trial. He said that the State offered to recommend a sentence of twenty years at 100% in exchange for a plea of guilty. Counsel suggested to Petitioner that they counter the State's offer with an agreement to plead guilty to the lesser offense of aggravated sexual battery in exchange for a sentence of eight years. Petitioner did not authorize the "counteroffer" and decided to proceed to trial.

Counsel said that he did not feel it was necessary to interview Dr. Hines prior to trial because he knew the scope of his testimony from his medical reports. Moreover, Dr. Hines' report referenced other sexual abuse allegations by the victim against Petitioner, and he wanted to avoid opening the door to that testimony.

Counsel said that he sent two letters to the district attorney's office requesting the victim's latest address so that he could interview her before trial. He made three attempts to conduct the interview but was refused access to the victim by the victim's niece. On two different occasions Counsel viewed the videotape of the victim's deposition which was taken in connection with her civil lawsuit against the nursing home so that he could get a feel for how the victim would handle herself at trial.

The victim testified at trial from her wheelchair. Counsel described the victim as "pitiful," and it was "tortuous" for her to testify. During cross-examination, he attempted to ask background questions in order to establish that the victim had some manual dexterity which would support Petitioner's defense that the victim's injuries were self-inflicted. He said that he asked the victim what types of activities she liked to engage in at the nursing home, and the victim responded that she enjoyed reading her Bible. After that, counsel felt it was prudent not to continue this line of questioning, and he concluded his cross-examination a short time later.

On cross-examination, counsel said that he was not aware that another male nurse was working on the victim's floor at the time of the offense. Nor was he aware that Lynn Davis, the director of nursing at the nursing home, apparently made a note in her records that Dr. Hines, during a conversation on April 1, 1999, expressed some doubt about the victim's explanation of how she was injured. Counsel said, however, he would still not have called Dr. Hines as a witness because of the references to other incidents of sexual abuse in his notes. Counsel was also not aware that Kammie Glen said she was working the same shift as Petitioner on March 30, 1999, and that she saw nothing unusual occur that night. Counsel was not aware that Roosevelt Nelson ["Rose"] had actually made two reports about the incident, instead of just one. He said that both reports, however, were consistent with each other and consistent with Ms. Nelson's testimony at trial.

Counsel said that he did not remember that the victim said during her deposition that the nursing home had a dog, even though the nursing home did not own any dogs. Counsel agreed that he was aware that the victim's description during the deposition of other incidents of sexual abuse allegedly committed by Petitioner did not match her description of the alleged digital penetration. Counsel observed, however, that he did not want to open the door to the fact that the victim had testified in her deposition that Petitioner had penetrated her once anally, and made her perform fellatio twice prior to the March 1999 incident. Counsel said that he did not review the nursing home's records or the victim's medical chart.

The post-conviction court ruled from the bench at the conclusion of the evidentiary hearing. Based on the evidence heard, the court found that counsel rendered effective assistance and denied Petitioner's request for post-conviction relief.

## II. Standard of Review

Petitioner argues that the trial court erred in finding that counsel's assistance before and during trial was effective. Specifically, Petitioner contends in his appeal that counsel failed to

-6-

articulate a "good reason" why he did not call Dr. Hines as a defense witness or why he did not use the victim's deposition to demonstrate her senility and the inconsistencies in her descriptions of the types of alleged sexual abuse. Petitioner also contends that counsel was ineffective for failing to request the personnel files of the other employees, for failing to bring out that the victim complained of rectal, not vaginal, bleeding when she was admitted to the hospital, for failing to more vigorously cross-examine the victim, and for failing to discover an alternative theory as to how the victim was injured on March 31, 1999.

A petitioner seeking post-conviction relief must establish his allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f) (2003). However, the trial court's application of the law to the facts is reviewed *de novo*, without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). A claim that counsel rendered ineffective assistance is a mixed question of fact and law and therefore also subject to de novo review. *Id.*; *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must establish that counsel's performance fell below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In addition, he must show that counsel's ineffective performance actually adversely impacted his defense. *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067, 80 L. Ed. 2d 674 (1984). In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *Hellard v. State,* 629 S.W.2d 4, 9 (Tenn. 1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. *Strickland,* 466 U.S. at 689, 104 S. Ct. at 2065. Rather, counsel's alleged errors should be judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time. *Id.* at 690, 104 S. Ct. at 2066.

A petitioner must satisfy both prongs of the *Strickland* test before he or she may prevail on a claim of ineffective assistance of counsel. *See Henley v. State,* 960 S.W.2d 572, 580 (Tenn. 1997). That is, a petitioner must not only show that his counsel's performance fell below acceptable standards, but that such performance was prejudicial to the petitioner. *Id.* Failure to satisfy either prong will result in the denial of relief. *Id.* Accordingly, this Court need not address one of the components if the petitioner fails to establish the other. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

Petitioner initially argues that the analysis in *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), not *Strickland*, governs his ineffective assistance of counsel claim. That is, Petitioner contends that his counsel's representation was so deficient that there was "an actual breakdown of the adversarial process during the trial of [his] case," and prejudice is thus presumed. *Id.*, 466 U.S. at 657-58, 104 S. Ct. at 2046. In *Cronic*, the Supreme Court held that

[t]he right to the effective assistance of counsel is thus the right to require the prosecutor's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted – even if defense counsel may have made demonstrable errors – the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated.

*Id.*, at 656-657. The *Cronic* Court acknowledged that there are some "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id.* at 658. Most notably, prejudice may be presumed when an accused is completely denied access to an attorney or when the accused's attorney is prevented from assisting the accused "during a critical stage of the proceeding." *Id.* at 659 n.25.

The Supreme Court later clarified that "[w]hen we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete." *Bell v. Cone*, 535 U.S. 685, 686-87, 122 S. Ct. 1843, 1851, 152 L. Ed. 2d 914 (2002); *see also Bell v. Quintero*, ___ U.S. ___, 125 S. Ct. 2240, 161 L. Ed. 2d 506 (2005); *Wallace v. State*, 121 S.W.3d 652 (Tenn. 2003). Where a petitioner's complaints are based on specific errors that are sporadic in nature, rather than complete, then counsel's performance is subject to *Strickland*'s two-prong test based on performance and prejudice. *Cone*, 122 S. Ct. at 1851-52; *Wallace*, 121 S.W.3d at 660.

In the instant case, Petitioner does not contend that his counsel did not mount a defense, interview witnesses, or cross-examine the State's witnesses. The gist of his argument instead is that counsel did not do some of these activities well. Because Petitioner has failed to demonstrate that his counsel's failure was complete, we will analyze Petitioner's claims under the *Strickland* test for "actual prejudice." *See Quintero*, 125 S. Ct. at 2241-2242; *Cronic*, 466 U.S. at 659 n.26, 2039 S. Ct. at 2047 n.26.

## III.  Failure to Investigate

Petitioner contends that counsel's assistance was deficient because he failed to interview Dr. Hines or Ms. Davis, and he thus was unaware that the victim had a history of urinary tract infections, that she complained of rectal bleeding when she was admitted to the hospital, and that Dr. Hines had expressed doubts as to the victim's explanation of the cause of her injuries. Petitioner argues that if counsel had done a more thorough investigation of the victim's medical history, he might have been able to launch a more effective defense. For example, Petitioner contends "that this information would have allowed trial counsel to argue that the injuries were also consistent with other explanations . . . such as that the victim personally scratched her vaginal area to try to alleviate the itching and burning caused by a urinary tract infection."

We begin this analysis by noting that "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices

made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690-91, 104 S. Ct. at 2066.

Counsel testified that he reviewed Dr. Hines' medical report concerning his examination of the victim after she was admitted to the hospital. The report was consistent with Ms. DiScenza's findings and the victim's allegations. Counsel said that Dr. Hines' report also noted that the victim alleged that Defendant had sexually abused her in the past, and counsel felt that Dr. Hines' potential testimony at trial would have been detrimental to Petitioner's defense. Counsel said that he was "pleasantly surprised" that the State did not call Dr. Hines as a witness during its case-in-chief. Counsel said that it would not have been beneficial to bring to the jury's attention that the victim had apparently also complained of rectal bleeding on March 30, 1999.

At the post-conviction hearing, Dr. Hines said that it was his opinion that the laceration on the victim's vagina was not self-inflicted, nor was it caused by the insertion of the catheter. Dr. Hines agreed that the victim was prone to urinary tract infections, but he could not recollect if she had ever bled as a result of an infection. Dr. Hines said that the victim's profuse bleeding at the time she was admitted to the hospital was not consistent with any of her medications or the insertion of a catheter.

In light of Dr. Hines' testimony at the post-conviction hearing, we fail to see how Petitioner was prejudiced by counsel's decision not to call Dr. Hines as a witness. Dr. Hines adamantly denied that the victim's injuries were self-inflicted, which is the only theory of defense suggested by Petitioner. Nor has Petitioner demonstrated that he was prejudiced by counsel's failure to investigate the victim's complaint of rectal bleeding when she was admitted to the hospital. During her deposition, the victim testified that "he put that thing in my mouth two times," and "he tried to put that thing in my tail hole." Counsel's decision to not pursue the victim's complaint on March 30, 1999, of rectal bleeding was reasonable in light of the facts and circumstances of the case at the time counsel was developing his trial strategy.

Petitioner contends that counsel's assistance was ineffective because he failed to call Ms. McCarthy, Ms. Branch and Ms. Malone as witnesses. Petitioner also argues that counsel should have discovered that Kammie Glen, an employee of the nursing home, said that she did not see anything unusual happen during her shift, and that another male nurse was working on the victim's floor that night. Petitioner contends that Ms. Davis would have testified that Dr. Hines expressed doubts about the victim's explanation for her injuries.

Petitioner's counsel said that Petitioner did not include Ms. McCarthy and Ms. Branch on the witness list he gave to counsel. Counsel said he interviewed Ms. Malone. Ms. Malone had not seen anything occur in the victim's room on March 30, 1999, and adamantly considered the masturbation theory "preposterous." Counsel said he attempted to interview the nursing home's director, but was unsuccessful.

When a petitioner contends that his trial counsel failed to discover, interview or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the post-conviction evidentiary hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). This is generally the only way to show that the failure to identify or interview witnesses resulted in the denial of evidence which prejudiced the petitioner. *See id*. None of these potential witnesses testified at the post-conviction hearing. In addition, Petitioner concedes that neither Ms. Branch, Ms. McCarthy nor Ms. Malone knew any information about the incident giving rise to the charges. Ms. Malone's view that Petitioner's theory of defense was "preposterous" would certainly have been detrimental. Petitioner has failed to demonstrate that he was prejudiced by counsel's failure to call these people as witnesses at trial.

Petitioner also suggests that counsel could have discovered whether the victim had lodged similar complaints against other male employees or whether she was prone "to create dramatic stories." Petitioner also argues that there were other employees at the nursing home on March 30, 1999, who did not notice anything unusual occur in the victim's room. Petitioner did not offer any proof at the evidentiary hearing that the victim had made other complaints prior to the incident, nor did he offer the testimony of any of the other employees at the nursing home at the evidentiary hearing. We conclude that the evidence does not preponderate against the trial court's finding that Petitioner failed to show that his counsel's assistance in this regard was ineffective.

Petitioner relied on the victim's description of a nonexistent dog at the nursing home during her deposition in her civil litigation as evidence of the victim's senility. Petitioner contends that the victim's testimony during her deposition in her civil case "differs somewhat from the story she told during the criminal trial" and thus could have been used for impeachment purposes.

In her deposition, the victim graphically described numerous incidents of sexual abuse allegedly engaged in by Petitioner other than the incident giving rise to the charges. Counsel testified at the post-conviction hearing that he did not believe that Petitioner's defense would be benefitted by bringing these allegations to the attention of the jury through the victim's cross-examination. On appeal, this Court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsel's behavior by "20-20 hindsight." *See Hellard*, 629 S.W.2d at 9. Moreover, in light of the victim's testimony during her deposition, we fail to discern how Petitioner was prejudiced by his counsel's decision not to use the victim's prior testimony for impeachment purposes.

Petitioner contends that counsel should have investigated further to develop an alternative theory of defense. Petitioner does not specifically define those alternatives other than presenting evidence that the injury was self-inflicted. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own actions or statements." *Strickland*, 446 U.S. at 691, 104 S. Ct. at 2066. Counsel's choice of defense was based on Petitioner's witness, Ms. Boring, who testified that she had seen the victim masturbating with a hairbrush prior to the commission of the offense. The fact that the jury did not find Ms. Boring's testimony credible does

not render counsel's decision ill-advised when viewed under the circumstances present at the time of trial. *Hellard*, 629 S.W.2d at 9-10. Petitioner is not entitled to relief on this issue.

## IV. Failure to Effectively Cross-examine the Victim

Petitioner contends that counsel's conduct was below the standard demanded of criminal attorneys when he failed to vigorously cross-examine the victim. Petitioner argues that counsel should have demonstrated to the jury that the victim could be led during her testimony and that she was given to "flights of fancy."

Counsel testified at the evidentiary hearing that the victim testified from her wheelchair. The victim was able to answer questions posed to her, but her communication was "tortuous." Nonetheless, counsel attempted during cross-examination to show that the victim had sufficient manual dexterity to masturbate. He asked her what activities she enjoyed, and the victim responded that her favorite activity was reading her Bible. Counsel said that he did not pursue this line of questioning any further because he feared it would only increase the jury's sympathy for the victim.

Petitioner's allegations concerning counsel's cross-examination relate to matters of trial strategy or tactics. "Counsel has some discretion in conducting the defense and is entitled to use his best judgment in matters of trial strategy or tactics." *Taylor v. State*, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991) (citing *McBee v. State*, 655 S.W.2d 191, 193 (Tenn. Crim. App. 1983)). The evidence does not preponderate against the trial court's finding that Petitioner failed to prove that his counsel's assistance during the victim's cross-examination was ineffective.

## CONCLUSION

In view of the foregoing, we affirm the judgment of the post-conviction court.

_____

THOMAS T. WOODALL, JUDGE
