******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ESPINOSA, J., with whom ZARELLA, J., joins, dissenting. I disagree with the majority's conclusion that the present case calls for the application of *United States* v. *Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), to the claim of the petitioner, Douglas Davis, that his attorney rendered ineffective assistance during his sentencing hearing. The facts of this case simply do not constitute "circumstances that are so likely to prejudice the accused that the cost of litigating their effect . . . is unjustified." Id., 658. Instead, this appeal is appropriately resolved by the application of *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Pursuant to *Strickland*, I conclude that, assuming, without deciding, that defense counsel's performance during the sentencing hearing was deficient, the habeas court properly denied the petition because the petitioner failed to prove that he had been prejudiced. Accordingly, I respectfully dissent.

The majority rests its conclusion on defense counsel's statement during the petitioner's sentencing hearing: "Your Honor, I agree with *everything that everybody said so far*, and I don't think there's anything left to say from my part." (Emphasis added.) The majority interprets defense counsel's statement to mean that he specifically agreed with the prosecutor's recommendation that the trial court impose the maximum sentence allowed under the petitioner's plea agreement. On the basis of that statement, the majority concludes that there was a complete breakdown in the adversarial process, justifying the application of *Cronic* to the petitioner's ineffective assistance of counsel claim. I disagree with the majority for two reasons. First, the majority ascribes a meaning to defense counsel's statement, which, although possible, is not consistent with the context in which the statement was made. Viewed in that context, defense counsel's statement conveyed general agreement with the sentiments that had been expressed during the emotionally charged sentencing hearing, not a specific agreement with the state's requested sentence. Second, the majority's insistence that defense counsel was required to argue for a lower sentence misinterprets both *Cronic* and *Strickland*. I discuss each of these points in turn.

The court opened the sentencing hearing with some prefatory remarks, noting the tragic circumstances that had necessitated the proceeding, and stating that "the saddest thing is to come to court to sentence someone to jail for killing another human being . . . ." The court recognized that the petitioner's life had been ruined, but, "more importantly, no matter what the court does for the victim's family, you can't bring the victim back,

and there's no number of years that's going to make [the family] happy." The court then particularly remarked on the lamentable proliferation of guns, specifically in the city of New Haven, where "it appears [that] . . . everyone in town carries a gun. . . . [I]t's a very sad, sad situation."

The prosecutor next addressed the court, echoing the court's sentiments regarding the tragedy of losing a loved one to violence. He then introduced the victim's family members, each of whom spoke of the personal loss that he or she had endured as a result of the victim's death at the petitioner's hands. The victim's father spoke first, addressing the petitioner: "You messed the whole family up by killing my son. . . . I guess we'll never get over it, but you got your life, and he's gone." The court offered some comfort to the victim's father, stating: "[T]o lose a child [is] probably the worst thing that can happen to a family. But to lose a child in a violent death to me is unthinkable. And I could never tell you I know the emotions you're going through because I can't, and I hope I never do, sir." Another member of the victim's family then spoke, stating that he has never seen the petitioner show any sign of remorse, nor has he apologized for his crime. The court acknowledged that the presentence investigation (PSI) report reflected that the petitioner had told his probation officer that he cannot forgive himself for what he did, but, the court continued, "I know for the family, it would be nice if he looked back and looked you in the eyes and [said] 'I'm sorry.' It would ease some of the pain, I understand that, sir."

Two of the victim's sisters and a cousin also spoke. Their statements expressed a profound sense of loss and pain at the pointlessness of the crime. One of the victim's sisters stated: "All of this was over $50." The victim's family would have given the petitioner $50, she further stated, if only they could have kept their brother and son and cousin. The petitioner's family, they noted, could visit the petitioner in prison when they chose to do so; for the victim's family, the only place they could visit was the cemetery.

At that point in the sentencing hearing, the court, the prosecutor, and five members of the victim's family each had spoken of the pain and suffering that the family had endured, and of the senselessness of the crime. Seven people had all spoken to this common theme, and some of the family members wept as they expressed their pain. The statements of the victim's family members comprised the vast majority of the sentencing hearing. After they had finished speaking, the prosecutor, when called upon by the court, made a very brief statement recommending a sentence, stating: "Thank you, Your Honor. Needless to say, the state recommends twenty-five years to serve."

At that point, the court called upon defense counsel,

who stated that he agreed with "everything that everybody said so far . . . ." He made this statement after the court, then the prosecutor, then the victim's family members, all had talked about the tragic circumstances of the crime and the suffering experienced by the family members. If this appeal involved a question of statutory interpretation, it would perhaps be appropriate to parse the meaning of the terms "everything" and "everybody," but this case is about the reasonable meaning of defense counsel's statement, which must be understood in the context of the preceding statements by the victim's family members expressing intense personal suffering and loss. The natural and respectful response to those statements is to acknowledge their validity, and that is what defense counsel did. From the context, it is apparent that defense counsel was respectfully agreeing that this was a tragedy, and that the pain and suffering of the victim's family was immeasurable. Nothing in the transcript suggests that anyone in the courtroom heard that statement to express specific agreement with the state's recommended sentence. Defense counsel's statement must be understood in light of the requirement that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland* v. *Washington*, supra, 466 U.S. 689. Interpreting counsel's statement in the most negative way possible, particularly when a more likely and benign understanding of the statement is obvious from the record, is not consistent with the general presumption of competent representation by counsel.

The error in the majority's interpretation is that it confuses defense counsel's respectful acknowledgment of both the expressed grief of the family members and the tragedy of the circumstances with his substantive input, which was that he had nothing to add. Specifically, he stated: "I don't think there's anything left to say from my part." Properly analyzed, therefore, defense counsel's action was not, as the majority claims, that he expressed agreement with the sentencing recommendation of the prosecutor, but that he failed to present any argument in mitigation. That distinction renders *Cronic* inapplicable to the facts of the present case.

In *Cronic*, decided on the same day as *Strickland*, the United States Supreme Court laid out three "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *United States* v. *Cronic*, supra, 466 U.S. 658. Those three circumstances are: (1) if the defendant is denied counsel completely or at a critical stage of the proceedings, including times when counsel is "totally absent" or "prevented from assisting the accused"; id., 659 and n.25; (2) if "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; id., 659; and (3) if it is unlikely that even a fully competent attorney could provide effective assistance. Id.,

659–60; see also *Mickens* v. *Taylor*, 535 U.S. 162, 166–67, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002). In those circumstances, the court stated, the defendant does not have to make a showing of prejudice; instead, prejudice can be presumed. *United States* v. *Cronic*, supra, 658. The United States Supreme Court subsequently explained the second circumstance it set forth in *Cronic*: "When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete." *Bell* v. *Cone*, 535 U.S. 685, 697–98, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); id. (concluding that failing to produce mitigating evidence and waiving closing argument "are plainly of the same ilk as other specific attorney errors" and *Strickland* is appropriate test). Even when defense counsel's representation of his client is poor, courts do not presume prejudice and, instead, analyze it pursuant to *Strickland.* See id.

The United States Supreme Court has recognized that it will be rare that *Cronic*, and not *Strickland*, will be the appropriate test in a claim of ineffective assistance of counsel. See, e.g., *Florida* v. *Nixon*, 543 U.S. 175, 190, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004). Most tellingly, the court in *Cronic* did not find that the circumstances presented in that case were worthy of a presumption of prejudice.[1] *United States* v. *Cronic*, supra, 466 U.S. 666–67. In that case, the respondent was indicted on mail fraud charges and, shortly before the scheduled trial date, the respondent's counsel withdrew. Id., 649. The court appointed a young attorney who primarily practiced real estate law, and who had never before tried a case to a jury, to represent the respondent. Id., 649, 665. Additionally, the attorney was given only twenty-five days to prepare for trial, despite the fact that the government had spent four and one-half years investigating the case and reviewing thousands of documents. Id., 649. Even with these facts, the court did not presume that defense counsel's actions prejudiced the respondent and, instead, remanded the case for consideration under the *Strickland* test. Id., 666–67, 666 n.41. The court's determination in *Cronic* that the presumption of prejudice did not apply even under the egregious facts presented in that case illustrates how narrowly the presumption is applied. Put simply, if the presumption of prejudice did not apply to the factual circumstances set forth in *Cronic*, then the presumption clearly does not apply in the present case.

Courts that have subsequently considered *Cronic* have made clear that a presumption of prejudice is applicable only in exceptional circumstances. Instead, *Strickland*'s two part inquiry applies to even egregious lapses in performance. See *Smith* v. *Brown*, 764 F.3d 790, 797–99 (7th Cir. 2014) (*Cronic* prejudice presumption inapplicable, where, during trial, defense counsel did not adequately cross-examine witnesses or call own witnesses, failed to investigate facts of case, did not give

meaningful closing statement, and, during sentencing hearing, failed to offer suggested sentence or mitigating evidence); *United States* v. *Theodore*, 468 F.3d 52, 55–57 (1st Cir. 2006) (holding *Cronic* presumption of prejudice inapplicable, despite defense counsel's: failure to review relevant materials provided by government and to interview any witnesses besides defendant; submission of open-ended questions on cross-examination; lack of familiarity with rules of evidence and federal subpoena process; and failure to litigate or seek reconsideration of successful motion to quash filed by sole witness subpoenaed by defense counsel); *Scarpa* v. *Dubois*, 38 F.3d 1, 4–5, 9–10 (1st Cir. 1994) (*Cronic* presumption of prejudice inapplicable despite defense counsel's failure to call witnesses and, in closing argument, conceded sole contested elements of charged crimes and encouraged jury to accept government's testimony), cert. denied, 513 U.S. 1129, 115 S. Ct. 940, 130 L. Ed. 2d 885 (1995). The facts of the present case, in which the petitioner's claim rests on a misreading of a single statement by defense counsel, pale in comparison to these cases in which courts have nonetheless declined to apply *Cronic*.

Notwithstanding the reservation of the presumption of prejudice standard set forth in *Cronic* for the rare circumstance, the majority concludes that the facts of the present case demonstrate that defense counsel entirely failed to subject the prosecution's case to *meaningful* adversarial testing. I conclude, on the contrary, that the record demonstrates that defense counsel failed to subject the prosecution's case to what he believed would have been *meaningless* adversarial testing. Defense counsel testified in the habeas trial that he had concluded that he had no good arguments to make in support of a shorter sentence, and that he believed that making a substantive argument could *prejudice* the petitioner. The risk of prejudice was real. The trial court had specifically warned the petitioner, during the plea hearing, that the court was free to sentence him to more than twenty-five years.[2] Reasonable minds may differ as to whether counsel's assessment of his options was correct, and whether his performance was deficient based on his failure to act on the basis of his assessment of the situation. But, given defense counsel's testimony at the habeas trial, the majority's conclusion that his failure to present an argument at the petitioner's sentencing hearing constituted a failure to subject the prosecution's case to meaningful adversarial testing is incorrect, and does not give proper effect to the narrow set of factual circumstances to which *Cronic* applies.

The reasons that defense counsel failed to argue for a specific sentence within the twenty to twenty-five year range that the petitioner faced at his sentencing hearing are apparent from the record. That record reveals that defense counsel had secured a *very* good

deal for the petitioner, the merit of which became even more clear when defense counsel received the extremely negative PSI report shortly before the sentencing hearing, and the fragility of which was made apparent by the emotionally charged sentencing hearing itself.

The advantageousness of the deal that counsel had negotiated for the petitioner was clear even before the PSI report was completed. The facts of the crime were shocking. The petitioner killed an unarmed man by shooting him in the abdomen at close range during a dispute over a game of dice. The state had a very strong case against the petitioner. The state had eyewitnesses to the shooting, one of whom was present at the dice game when the petitioner shot the victim. The petitioner had confessed to the shooting, although he equivocated as to whether he had intended to shoot the victim. That is, he claimed that the gun fired "by itself," but he also expressed regret for "pulling the trigger." The petitioner further admitted fleeing the scene after shooting the victim, and he had the murder weapon on his person when he was apprehended by the police. Given the circumstances, it is not surprising that defense counsel concluded that twenty-five years was the "best outcome [that the petitioner] could have hoped for under the circumstances." With these facts, one would expect the state to proceed to trial rather than to offer a deal.

On the basis of all of these facts, the petitioner was charged with murder in violation of General Statutes § 53a-54a, which carries a maximum sentence of sixty years of incarceration, with a mandatory minimum sentence of twenty-five years to serve. See General Statutes §§ 53a-35a (2) and 53a-35b. Defense counsel relied on the fact that the petitioner was intoxicated at the time of the shooting to obtain the deal, which provided that if the petitioner pleaded guilty to manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a, and carrying a pistol without a permit in violation of General Statutes § 29-35 (a), he would be exposed to a minimum sentence of twenty years and a maximum sentence of twenty-five years for both charges.

When defense counsel inquired as to the petitioner's criminal record, the petitioner responded that he had some drug convictions. The PSI report was then completed, and provided to defense counsel. Contrary to his original representations to defense counsel, the petitioner had a much longer and more significant criminal record than he had disclosed. In reading the PSI report, defense counsel learned that the petitioner had convictions for assault, felony larceny, sale of narcotics, failure to appear, breach of the peace and violation of probation. The petitioner confirmed at the habeas trial that he had informed defense counsel only about his drug convictions.

The PSI report recommended that the petitioner receive the maximum period of incarceration for his offenses, which, if the court had imposed consecutive sentences, would have resulted in a total effective sentence of forty-five years. See General Statutes § 53a-35a (5) and (8); General Statutes § 29-37 (6). The information in the PSI report made the basis of that recommendation apparent, as it contained only negative information about the petitioner's background. The petitioner had never completed high school, dropping out before finishing the tenth grade. Additionally, although he was twenty-five years old at the time of the sentencing hearing, the petitioner had virtually no employment history. He had in fact only been legitimately employed twice: once for one to two months in 1994, and again for three to four months in 2003. He had a long history of alcohol and drug abuse. He began drinking alcohol at age ten and, by age sixteen, was drinking daily to the point of intoxication. He also had a history of using marijuana and phencyclidine, commonly known as PCP, several times every day for years, a habit that he supported by selling cocaine.

The petitioner also lacked stable connections to family. His parents had both been heavy alcohol and drug abusers and had no relationship with one another after his birth. He moved between the custody of his mother and his grandfather and, when he was a teenager, the Department of Children and Families placed him in a state facility. At age sixteen, he ran away from the facility and had been staying on his own or with family since that time. In 2002, he married a woman who also has a lengthy criminal record and who, at the time the PSI report was prepared, was incarcerated. The two had been separated at the time of the commission of the crime in the present case. The petitioner has no biological children, although his wife has two children from a previous relationship. Although the petitioner said he " 'was like a father to them,' " he did not know the present whereabouts of the children. The PSI report stated that "[the petitioner] expressed a modicum of remorse and appears to be overwhelmed by the enormity of his actions that night. He may indeed regret killing the victim, however the offense could never be considered an accident."

At the habeas trial, defense counsel testified that, ordinarily with facts like the ones in the present case, the petitioner would be facing murder charges, so a plea deal subjecting him to twenty-five years in prison was "the best outcome he could have hoped for under the circumstances." Defense counsel further testified that the petitioner's "criminal record was a lot more extensive than [he] originally had anticipated, [which] was a problem," and that "the impact of the victim's family at the sentencing hearing was quite substantial in their grief and their loss and it was very persuasive

to the court under the circumstances." Defense counsel explained that he had hoped to argue for a more lenient sentence for the petitioner based on lack of a substantial criminal record but, when he read the PSI report, he realized that would not be an option.

At the habeas trial, defense counsel summed up his decision not to argue for a sentence of a specific number of years, stating: "[A]t the sentencing there was a large crowd of people, most of whom were related to the victim, his father, brother, sister, so on and so forth. It was one of those very emotion-packed hearings where under the circumstances and due to the fact that there was a death, you know, the emotions were running high. The judge was clearly affected by that fact and sympathetic to the family and sympathetic to the victim. He was fully aware of what the [petitioner's] record was and his background was through the [PSI] report. None of the facts, as presented by either the victim's family or the state, were in dispute, and so at that point the only thing I could have said would have been perfunctory and under the circumstances probably would have elicited more of a negative response from the court than a positive one, and because [the trial court] was familiar with anything that I could have said, I thought it was better not to say anything under the circumstances and simply let the court make its decision based on what it knew . . . ." Defense counsel also stated: "Nothing I could have said under the circumstances was going to change what [the trial court] ultimately decided to do, and so for me to really make any argument that [the court] was already familiar with under the circumstances I thought would have been more hurtful than helpful at the time."[3]

If the majority applied *Strickland*, it would conclude, as both the habeas court and the Appellate Court did, that the petitioner cannot prevail on his claim. See *Davis* v. *Commissioner of Correction*, 147 Conn. App. 343, 363, 81 A.3d 1226 (2013). The petitioner cannot show that, but for defense counsel's statement, he would have received a different sentence, so he cannot demonstrate actual prejudice. See *Strickland* v. *Washington*, supra, 466 U.S. 695–96. The PSI report contained the recommendation that the petitioner receive the maximum sentence and the trial court stated at the sentencing hearing that it was relying on the PSI report in determining that there were no mitigating factors that it could use to sentence the petitioner to less than twenty-five years. It is telling, in fact, that at the habeas trial, the petitioner presented no evidence as to what mitigating evidence his defense counsel *could* have presented during the sentencing hearing. Even if I were to assume, arguendo, that defense counsel did provide ineffective assistance at the petitioner's sentencing hearing, I agree with the habeas court and the Appellate Court that the petitioner was not prejudiced. Accordingly, I would affirm the judgment of the Appellate

Court.

For the foregoing reasons, I respectfully dissent.

[1] The majority acknowledges that the United States Supreme Court declined to apply the *Cronic* rule in *Cronic* itself, but then states that this "nuance" does not apply to the present case because this case involves a petitioner's claim that there was a complete breakdown in the adversarial process, whereas in *Cronic* the claim was that under the circumstances of that case, it was unlikely that even a fully competent attorney could have provided effective assistance. See footnote 6 of the majority opinion. Because the Supreme Court, after conducting the very fact-intensive analysis that is required in *any* case where a petitioner claims ineffective assistance of counsel, concluded that under the facts of that case, the petitioner had not established that the circumstances arose to the level of the third circumstance set forth in *Cronic*, and therefore it was not appropriate to presume prejudice, the majority makes the contorted assertion that somehow *Cronic* "held that prejudice could not be presumed with respect to the *third* category." (Emphasis in original.) Id. That assertion is based on a misreading of the *Cronic* decision. The Supreme Court specifically stated that, if *proven* to exist, the third circumstance enumerated in *Cronic* gave rise to the same presumption of prejudice that resulted from the first and second circumstances. The reason that the court did not presume prejudice in *Cronic* is because, as I have explained, the court set the bar very, very high before it would conclude that a petitioner had satisfied his burden to demonstrate that one of the three circumstances existed that justified the presumption of prejudice. Nothing in *Cronic* suggests that the analytic process with respect to the second and third circumstances involves anything other than what the court did in *Cronic* itself—a very case-specific inquiry to determine whether the petitioner has established that under the facts of that case, prejudice should be presumed.

[2] If the court did so, the petitioner would be allowed to withdraw his guilty plea and proceed to trial. Given the strength of the state's case, the likelihood of conviction for a charge of murder was high.

[3] As I have explained in this dissenting opinion, because I conclude that the petitioner has not demonstrated actual prejudice, I need not resolve the question of whether defense counsel's performance was deficient. Given defense counsel's testimony at the habeas hearing, however, I am compelled to observe that it is reasonable to question whether defense counsel's performance was deficient at all. As defense counsel testified, he appears to have made the strategic decision to forgo a substantive argument because he had nothing of merit to offer in favor of a lesser sentence and he had concerns that, given the charged atmosphere in the courtroom and the trial court's statements expressing sympathy for the victim, he could prejudice his client.

---