Cite as 2021 Ark. App. 21

# ARKANSAS COURT OF APPEALS

DIVISION IV

**No.** CR–20–170

| | |
|---|---|
| JOSH M. BARRETT<br><br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br><br>APPELLEE | **Opinion Delivered** January 20, 2021<br><br>APPEAL FROM THE PIKE COUNTY CIRCUIT COURT<br>[NO. 55CR-17-48]<br><br>HONORABLE TOM COOPER, JUDGE<br><br>AFFIRMED |

## BRANDON J. HARRISON, Chief Judge

In 2018, a jury found Josh M. Barrett guilty of six counts of rape. He appealed, and this court affirmed the convictions. *Barrett v. State*, 2019 Ark. App. 167. Barrett filed a timely postconviction petition in the Pike County Circuit Court and alleged grounds for relief under Arkansas Rule of Criminal Procedure 37. The circuit court convened a hearing on Barrett's Rule 37 petition, received testimony from Barrett and his trial lawyer, John W. Yeargan, Jr., and ultimately denied the petition. Barrett has appealed the denial of his Rule 37 petition. We wholly affirm the circuit court's decision.

## I. *The Jury Trial*

Trial counsel Yeargan's examination of two witnesses during the trial is being challenged. Two critical witnesses during the trial were EB, who is Barrett's biological daughter and the victim of the crimes, and BB, who is EB's brother and Barrett's biological

son. A basic summary of the trial testimony places Barrett's Rule 37 arguments into context. We have omitted much of the graphic details in this opinion.

## A. EB's Trial Testimony

EB, who was seventeen years old when she testified, said that she lived with her parents until two years before the trial convened. It was approximately two years before the trial when she told her mom that her dad had raped her. When asked what the word "rape" means, EB replied, "It means when his penis goes in my vagina." She described certain events that took place approximately ten years ago in a red brick house "beside the Baptist Church" in Kirby, Arkansas, a house she shared with her brother, mother, and father. EB testified that when she was six or seven years old, her father would take her into the bathroom, set her on the sink, put her back against the wall, hold her legs up, and have intercourse with her. EB could not remember how many times it happened because it occurred so frequently—usually in the mornings when no one else was home and her mother was at work.

The rapes continued when EB's family moved to a different house in Kirby across from her Aunt Melissa's house when she was nine or ten years old. EB said that there was a washer and dryer in the bathroom in that house. Barrett would set EB on the washing machine and put his penis into her vagina, causing her pain. According to EB, this would usually happen in the mornings when her mother was at work. Sometimes her brother would be home; but "usually not" because he ate breakfast with their grandfather. EB said that the reoccurring rapes were a regular event, and she was unsure how frequently it happened "[b]ecause it happened so often." According to EB, the rapes, which occurred

2

in multiple places in the home and in various ways, ended when she was twelve or thirteen years old.

EB told the jury that she did not say anything to her father during these events because she was scared and confused about what was going on. EB also worried that no one would believe her. EB eventually disclosed the sex crimes to her mother, and EB later reported the crimes to law enforcement. EB stopped living in her parents' home and moved in with her maternal grandparents.

Barrett's trial counsel engaged in a short cross-examination of EB during the jury trial. The entirety of trial counsel's cross-examination is reproduced below.

TRIAL COUNSEL: [EB] how old are you?

EB: I'm 17.

TRIAL COUNSEL: And you go to school at Kirby?

EB: Yes.

TRIAL COUNSEL: Is that Kirby High School?

EB: Yes.

TRIAL COUNSEL: And you live with your maternal grandparents?

EB: Yes.

TRIAL COUNSEL: And did you go on a vacation to Florida in 2016?

EB: Yes.

TRIAL COUNSEL: And was that with your father's parents?

EB: Yes.

TRIAL COUNSEL: Please tell the court a little bit about the vacation? Where you went? What you did?

EB:                I don't really remember that much about it, but we went to Alabama and we stayed on the beach and stayed with my grandparents.

TRIAL COUNSEL:     Did you do anything besides go to the beach?

EB:                We did a few other things, but that was a few years ago, I don't really remember that much.

TRIAL COUNSEL:     Amusement parks, anything like that?

EB:                Not that I know of.

TRIAL COUNSEL:     Why did you go on this vacation?

EB:                When?

TRIAL COUNSEL:     Why?

EB:                Why? I just wanted to go and be with my, you know, grandparents and Melissa.

TRIAL COUNSEL:     Did your father, Josh Barrett, did he give permission?

EB:                No.

TRIAL COUNSEL:     Your mother, Tonya Barrett, did she give permission?

EB:                I'm not for sure. My grandparents talked to her.

TRIAL COUNSEL:     Did it make you mad that your dad would not let you go?

EB:                No. I had nothing to do with my dad at the moment.

TRIAL COUNSEL:     Were you given a typewritten statement of what to say today? How to testify?

EB:                No.

TRIAL COUNSEL:     Were you threatened by anybody if you didn't testify that you would be subject to charges?

4

EB:                     No.

TRIAL COUNSEL:     Okay.  I'll pass the witness, Your Honor.

On redirect, the State clarified that EB had already told her mom what had happened to her and that EB had moved in with her maternal grandparents before the 2016 beach vacation was taken.  EB also agreed that she did not know about the beach trip when she told her mother about what her father had done.

## B.  BB's Trial Testimony

EB's older brother, BB, testified for the prosecution and the defense.  During the State's case-in-chief, BB said that he had lived with his mother, father, and sister during the relevant time periods.  BB agreed that he had told the Arkansas State Police investigators that his dad had said that he did not remember what happened with EB because he was doing drugs.  Trial counsel did not cross-examine BB during the State's case-in-chief.

During the defense phase of the trial, BB testified that he and his sister spent a lot of time with his Aunt Melissa, who lived across the street from them and babysat them while their parents worked.  According to BB, he had never seen his father do anything bad to his sister, and his father tried to take good care of them.  The prosecutor cross-examined BB, and the following colloquy ensued.

PROSECUTOR:     Would you agree with me that in your statement that you indicated that you'd never known [EB] to lie?

BB:             Yes.

PROSECUTOR:     And did you give a statement that said that your dad told you he possibly did this, but he can't remember because he was on drugs?

BB:             Yes.

5

PROSECUTOR:     So you and your dad talked about this, correct?

BB:             Yes.

PROSECUTOR:     And your dad told you that he possibly did this, but he can't remember?

BB:             Yes.

PROSECUTOR:     And in your statement, did you indicate that you can't think of any reason that your sister would lie?

BB:             Yes.

PROSECUTOR:     And also, in your statement you indicated that you didn't care if dad did it or didn't do it, you would still live with your dad?

BB:             Yes.

PROSECUTOR:     You're that loyal to your dad?

BB:             Yes.

PROSECUTOR:     In your statement did you also say that your dad told you he did something stupid, but he can't go back and fix it now?

BB:             Yes.

PROSECUTOR:     And you also in your statement said you had no reason to believe that your dad was on drugs?

BB:             Yes.

PROSECUTOR:     Thank you.  Pass the witness.

On trial counsel's redirect examination, BB agreed that the "something stupid" phrase he said during his testimony referred to his dad's drug use.  Trial counsel asked BB, "And do you think [EB] is lying at this time?" BB replied, "Yes."  BB said he thought EB had made the story up because she wanted to go on the Florida trip and their dad would not let her

go. On recross-examination, BB agreed that this was the first time he had told anybody that his sister would have made up the rape allegations because she wanted to go on a beach trip.

## C. Other Witnesses' Testimony

Testimony from witnesses other than EB and BB also help inform the Rule 37 effort. We briefly summarize it now. EB's mother, Tonya Barrett, testified that she chose to not take EB to the doctor to be examined or checked for sexually transmitted diseases after the disclosure. She said that while she initially believed her daughter, she did not know if she believes her now. The children's aunt Melissa Breazeale testified that EB was very upset when she thought she was not going to be able to go on the beach trip. The aunt did not have an opinion on whether EB was lying and instead stated, "I love both parties that are involved."

Defendant Barrett testified in his own defense. He said that EB was angry because he had refused to let her go on a beach trip to Florida and that is why she had made up the allegations against him. Barrett denied raping his daughter. He stated,

> I don't know what else could I do to prove that I'm innocent from this. What else? But that girl sits up here and tells a story like a robot with no emotion at all, at all. She had no emotion. Now what little girl can do that with no emotion? I'm sorry, I was not the perfect father, but this didn't happen. This never would've happened no matter what kind of dope I used.

Barrett said that he never intended for his daughter to get hurt, that he did not spend time with her, and that he was not the father he should have been to EB. He also said that his son was his "main agenda." On cross-examination, Barrett admitted that EB went on the

7

beach trip after his wife gave her permission and that EB did not report the crimes to law enforcement until after she had returned from the trip.

Barrett's sister-in-law, Kristine McCann, is married to Tonya's brother. McCann testified that Barrett would punish EB but that she never saw any signs of sexual abuse. McCann told the jury that EB is "vindictive. She likes to lie." McCann detailed various ways EB seemed to have manipulated or twisted her story and concluded that EB was lying. Barrett's friend, Kevin Yandell, said that his daughter had been molested and that EB "didn't act nothing like that[.]" Yandell said he saw no signs of sexual abuse, so he did not think that Barrett did it. On cross-examination, he also admitted having used methamphetamine with Barrett.

## II. *The Rule 37 Hearing*

As we mentioned earlier, Barrett filed a timely petition for postconviction relief in the circuit court. In his sworn petition, Barrett identified certain written questions that he had sent to his trial counsel to ask EB and BB during cross-examination. Barrett testified during the hearing that his trial counsel did not ask the witnesses any of the questions that he had specifically requested. Trial counsel, John Yeargan, Jr., testified that he had been practicing criminal law for twenty-four years. Yeargan confirmed that the questions mentioned in the Rule 37 petition were the same ones Barrett had asked him to ask during the jury trial. Yeargan's stated goal in the case was for Barrett to be found not guilty or to have reduced punishment. His reported trial strategy was "not to allow in negative evidence or to reinforce negative evidence." Yeargan said that had some of Barrett's questions been

8

answered during the trial, it would have diminished Barrett's chances to be found not guilty and might have increased his punishment.

> I watched [EB]. Her answers were very definite. She knew all the details, the time when it happened, and she was a well-coached witness. . . . When she was testifying, she was sitting in the chair and she was a little bit forward and she had her hands clasped above her knees. And watching her, I knew that—. Never ask a question you don't know the answer to. I knew all of her answers, and they would be negative. And she appeared to be timid, embarrassed, and afraid. I was afraid if I got in too rigorous of an examination with her, that it might offend the jury and inflame them. So on this question, for instance, okay, your motive was to bring the charges because your parents —you wanted your parents to divorce. A possible answer would be, no, I didn't. My motive for the charges was not for my parents to divorce, but I wanted Josh out of the house so he would stop raping me. And I thought this would be negative testimony before the jury, so my trial strategy was to keep that out.

Yeargan further explained that he was afraid that if he had conducted a vigorous cross-examination of EB that a negative response related to the child forensic interviewer would come in as evidence in the case against Barrett.

As for not cross-examining BB, Yeargan said he chose not to do so because the prosecutor could then have asked him "do you know" questions that could have "opened up the doors to impeachment or negative testimony." An example he gave was: "Do you know that your father worked for the police department and he was fired because he was on meth?" In Yeargan's opinion, the written questions that Barrett wanted him to ask BB "would hurt his case rather than benefit it." Yeargan explained that he did not want to ask BB whether BB thought his father had raped EB. Expecting BB to answer, "No, [EB] is a liar," a question like that, in Yeargan's view, would allow the prosecutor to impeach BB with a prior statement BB had given to investigators about Barrett: "I've used so many drugs

9

I don't know whether or not I raped my daughter." Yeargan feared that this disclosure during the State's case could discredit the weight and credibility of BB's testimony. Yeargan conceded that BB was a very favorable witness to Barrett and extremely loyal. But he still concluded it was too risky to ask BB the proposed questions because of BB's prior statement to investigators. Yeargan also said that he did not ask BB where he and his sister spent most of their childhood (which was at Aunt Melissa's) because "weighing the evidence and balancing the evidence on negative testimony . . . I believe that they [the parents] worked in the daytime and they stayed with a babysitter, and then [the parents] were home in the evening."

The circuit court rejected Barrett's claim that trial counsel was ineffective in his cursory cross-examination of EB and failure to cross-examine BB because the alleged failures were professional judgment calls that aligned with counsel's overall trial strategy. The court also found that Barrett failed to show how a better cross-examination would have changed the outcome of the case.

### III. *Barrett is Not Entitled to Postconviction Relief*

Barrett argues that Yeargan's total failure to elicit evidence reflecting on the victim's credibility cannot be considered a strategic decision supported by reasonable professional judgment. In Barrett's judgment, Yeargan was ineffective as counsel because he cross-examined the victim in a cursory manner and failed completely to cross-examine her brother. Barrett concludes that he received ineffective assistance of trial counsel as guaranteed by the Sixth Amendment to the United States Constitution.

A.   The Right to Effective Assistance of Counsel

"The Sixth Amendment, applicable to the States by the terms of the Fourteenth Amendment, provides that the accused shall have the assistance of counsel in all criminal prosecutions.  The right to counsel is the right to effective assistance of counsel."  *Missouri v. Frye*, 566 U.S. 134, 138 (2012).  To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish (1) deficient performance by counsel falling below an objective standard of reasonable representation, and (2) prejudice, meaning a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  *See Bryant v. State*, 2013 Ark. 305, at 2, 429 S.W.3d 193, 196 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)).  A failure to satisfy either part of the test ends the claim. *Id.*  When reviewing a claim of ineffective assistance of counsel, we begin with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Strickland*, 466 U.S. at 689 (internal citation omitted).

In *United States v. Cronic*, 466 U.S. 648, 658 (1984), the Supreme Court of the United States recognized that some circumstances are so likely to prejudice the defendant that no showing of prejudice is necessary.  These narrow circumstances include the complete denial of counsel at a critical stage of the trial, the complete failure of counsel to subject the prosecution's case to meaningful adversarial testing, counsel's active representation of conflicting interests, and when defense counsel was appointed only a few minutes before the trial started.  *Id.* at 659–61.  To meet these narrow exceptions, an appellant must establish

11

that his or her trial counsel *entirely failed* to test the prosecution's case in any meaningful way. *Bell v. Cone*, 535 U.S. 685, 696–97 (2002).

Barrett has not established the extremely rare situation in which trial counsel completely failed to test the prosecution's case. We therefore review Barrett's ineffective-assistance claim under the *Strickland* standard.

### B. Trial Counsel Was Not Ineffective Under *Strickland*

First, we agree with Barrett that the jury trial hinged almost entirely on EB's credibility. Barrett called his case "a swearing match" between a defendant and the alleged victim. Only one prosecution witness (EB) claimed to have personal knowledge of the crimes. And the State presented no physical evidence to corroborate EB's testimony. During the jury trial, Barrett's counsel did not pointedly test or challenge EB's recital of the crimes' details. Although trial counsel identified EB's wanting her parents to divorce during the Rule 37 hearing as being a possible reason why EB may have lied, counsel did not raise that issue to the jury. Throughout the trial, counsel never meaningfully challenged EB's stated reason for why she delayed reporting the crimes for approximately two or three years after the last occurrence. More specifically, counsel did not test EB on why she delayed reporting the rapes to the authorities until after the beach trip in particular. During the Rule 37 hearing, counsel expressly admitted that he did not ask any of the lengthy and detailed written questions Barrett wanted him to ask EB and BB.

Granting that Barrett's proposed questions might have impeached EB's credibility, we still hold that this particular record does not support a reversal. Given the sensitive nature of this case, trial counsel's decision to forgo an extensive cross-examination of EB

does not, by itself, equate to ineffective assistance of trial counsel. *See, e.g.,* *Bryant v. State*, 2013 Ark. 305, 429 S.W.3d 193. Reasons support counsel's tactical decision to conduct a very brief cross-examination. Trial counsel was wary of a contentious cross-examination of EB, who had, in counsel's judgment, appeared timid and fragile during the State's direct examination. A more rigorous cross-examination might have evoked more emotion and greater sympathy from the jury. Also, trial counsel's examination of other witnesses, including BB, did elicit a possible reason why EB would have acted out of anger toward Barrett and hurl false allegations: Barrett harshly disciplined her, treated her differently than her brother, and would not allow her to travel to the beach, a trip that she strongly desired to take.

Moreover, it is not at all certain that additional questioning of EB or BB would have resulted in favorable testimony about the details of the crimes or EB's motivation for not reporting them earlier than she did. EB said on direct examination that she did not report the crimes because she was scared and felt that no one would believe her. Additional cross-examination on this point may have simply bolstered the State's case. Importantly, trial counsel was able to question other witnesses that elicited favorable testimony for Barrett that EB was liar and was not believed at the time of trial by her own mother or several other witnesses.

True, counsel could have asked at least some questions Barrett wanted him to ask in order to test EB's or BB's memories, perceptions, and motivations. But it is also true that counsel could have justifiably determined that an additional cross-examination of the siblings on these sensitive matters during the State's case in chief might have alienated the jury and

13

bolstered the State's case by producing more damaging evidence—including an admission to the effect that Barrett could not remember whether he had raped his daughter because he had done so many drugs. (A similar statement did come out during the State's recross-examination of BB during Barrett's case.)

In sum, Counsel Yeargan's decisions at trial were professionally reasonable and within the permissible scope of trial strategy given the circumstances. Barrett has not shown that had Yeargan asked the proposed questions, the trial had a reasonable probability of turning out differently. We therefore hold that Barrett has failed to satisfy either prong of the *Strickland* test and affirm the circuit court's denial of Barrett's Rule 37 petition.

Affirmed.

KLAPPENBACH and BARRETT, JJ., agree.

*John Wesley Hall* and *Samantha J. Carpenter*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Pamela Rumpz*, Sr. Ass't Att'y Gen., for appellee.